THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN O'TOOLE, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRENDA HANEY, Defendant-Appellant.

Fourth District   Nos. 4—91—0223, 4—91—0224 cons.

Opinion filed March 30, 1992.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant John O'Toole.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant Brenda Haney.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

A Vermilion County jury convicted defendants, Brenda Haney and John O'Toole, of solicitation of murder for hire (Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2). The trial court sentenced O'Toole to 25 years in prison and Haney to 27 years in prison. Because defendants present essentially the same arguments to this court, we have consolidated their appeals for purposes of disposition.

On appeal, both defendants make the following arguments: (1) the trial court should have suppressed the videotape that depicted defendants soliciting an undercover police agent to murder defendant Haney's ex-husband because the State did not comply with all of the statutory requirements for obtaining an eavesdropping authorization order; (2) the trial court erred by not excusing certain jurors for cause who had heard or read about the case; (3) the trial court erred by requiring defendant to admit to the elements of the crime charged before raising the defense of entrapment; (4) the trial court erred by allowing the State to introduce hearsay testimony; (5) the trial court erred in allowing the State to improperly

impeach a defense witness; and (6) the prosecutor made an improper closing argument. Defendant O'Toole individually argues that the court improperly considered at his sentencing hearing that his conduct threatened serious harm even though the threat of serious harm is inherent in the offense of solicitation of murder for hire. Finally, defendant Haney argues that the trial court disproportionately sentenced her as compared to defendant O'Toole.

We affirm.

## I. FACTS

Brenda Haney divorced her third husband, John Haney, on June 7, 1990. John received temporary custody of their three-year-old daughter, Kelly, pending a home investigation and study of both parents by the Illinois Department of Children and Family Services. Thereafter, Brenda, along with her 16-year-old daughter from her first marriage and her daughter's boyfriend, moved in with Brenda's boyfriend, John O'Toole, whom Brenda had been dating five months prior to her divorce from John Haney.

On August 3, 1990, O'Toole approached Ron Johnson, an acquaintance of his for eight years, at a gas station and asked Johnson if he would "knock off" someone. At that time, the date for the final hearing on permanent custody of Kelly had not yet been set. O'Toole had previously asked Johnson's father and brother to murder John, but both had refused. At first, Johnson also told O'Toole that he would not commit the murder. Brenda then joined the conversation and said that she thought her ex-husband would receive custody of Kelly, so she "wanted the bastard dead." Knowing that Johnson had served in the army as a demolitions expert, O'Toole suggested that Johnson rig an explosive device to John's car. Johnson again refused, but O'Toole continued to ask, insisting that "he wanted the motherfucker dead." Johnson asked if they were serious, and O'Toole responded that they were "dead serious." Johnson then feigned agreement and said he would put them in contact with a hit man; however, he really intended to inform the police of their request.

That night, Johnson contacted Agent Charles Casagrande of the drug enforcement unit of the Vermilion County police department, with whom Johnson was acquainted. Casagrande in turn contacted the Illinois State Police, Division of Criminal Investigation, which arranged an undercover sting operation as detailed below.

On August 6, Casagrande applied to the circuit court for an eavesdropping authorization order under section 108A—3 of the

Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 108A—3). The application named Johnson as the consenting party to the eavesdrop and O'Toole as the other party to the conversation, but did not name Brenda as a party to the conversation. After hearing testimony from Johnson and Casagrande in support of the application, the court granted the eavesdropping authorization order at 4:50 p.m. The technical services division of the Illinois State Police immediately set up a hidden videotape and audiotape recording device in the room next to room 105 at the Redwood Inn, a local motel.

That evening, after a briefing with Casagrande at the motel, Johnson again met with Brenda and O'Toole to find out if they were still serious and, if so, to make further arrangements for them to meet with the undercover agent. When they informed him that they still wanted it done, Johnson brought them to room 105 of the Redwood Inn to meet Dave McLearin, an undercover State Police officer posing as a hit man. On the way to the meeting, Johnson again asked if they were serious. Johnson explained that the hired killer they were going to meet would not like it if they pulled out after they met with him. O'Toole again repeated his eagerness to go through with the hit. Upon arriving at the motel, Johnson introduced Brenda and O'Toole to McLearin at the door to room 105 and then left to wait in his car as the other three went inside.

From 6:55 to 7:19 p.m., the technical services unit videotaped the conversation between Brenda, O'Toole, and McLearin. At defendants' trial, the videotape was admitted into evidence. The conversation thereon began as follows:

"AGENT McLEARIN: [Johnson] said that you're going to need something done.

DEFENDANT O'TOOLE: Yeah, we got a ... a ... a man, her ex-husband, needs to be tookin' [sic] out of the way—

McLEARIN: O.K.

O'TOOLE: —completely. He's wanting to take custody right now, and they're trying to take her child away from her.

* * *

McLEARIN: But you want him taken out of the way. How do you want ... what do you want ... an accident? Or do you want him —

O'TOOLE: Just instantly.

McLEARIN: You tell me.

O'TOOLE: Just instantly.

* * *

McLEARIN: O.K. Well, I have to know that you're serious, you know.

O'TOOLE: Oh, we're serious.

DEFENDANT HANEY: I'm dead serious.

O'TOOLE: Seriouser than a heart attack."

The three began to discuss a price and other details about how to kill John. They discussed John's schedule, when he would have Kelly with him, what car he drove, the wooden bumper on his car, where he worked, and the route he took to work. Brenda also drew a map for McLearin to show him how to get to John's house. They further discussed specific methods of killing John, such as rigging his car to explode or shooting him with a silenced gun at point-blank range.

McLearin repeatedly questioned Brenda and O'Toole about their seriousness, as shown by this dialogue:

"AGENT McLEARIN: You guys are sure you want this done, because, you know, this is serious business.

DEFENDANT O'TOOLE: We're positive, we're positive.

DEFENDANT HANEY: I want him out of my life.

O'TOOLE: I can tell you, we're serious as a heart attack.

HANEY: You know, after what he's done, I have no use for him. None."

They further discussed how McLearin could inform them that he had succeeded. Upon discussing the method of payment, O'Toole gave McLearin his post office box number and said he would leave payment in the box and tape the key to the box under a table in the post office. They also discussed the many possible alibis Brenda and O'Toole could devise to avoid suspicion that either of them killed John. Indeed, the only thing they did not make absolutely clear was the price, primarily due to defendants' lack of money. They explained to McLearin that their resources were minimal, but they nonetheless agreed to pay McLearin $1,000 for the killing: $250 down and $750 once McLearin had killed John. The videotape then ended with the following dialogue:

"AGENT McLEARIN: Now, what you want done is—just so there's no mistake here—

DEFENDANT O'TOOLE: There's no mistake.

McLEARIN: —because, hey, dead is forever, you know.

O'TOOLE: Yeah, I understand that. * * *

McLEARIN: And it's pretty serious, you know, and I don't want to take the chance and stuff here, and you come

back and you say, 'no, no that's not what I meant; I just want him hurt.'

DEFENDANT HANEY: No.

McLEARIN: If that's what you want, that's what we'll do.

O'TOOLE: No, we want him dead.

HANEY: Totally.

O'TOOLE: That's what we been wanting."

At that moment, several police officers burst into the room and arrested Brenda and O'Toole.

## II. ANALYSIS

### A. *The Eavesdropping Order*

■ Defendants first argue that the trial court erred by not suppressing the videotape recording because the State failed to comply with all of the statutory requirements for obtaining an eavesdropping authorization order under section 108A—3 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 108A—3). That section requires, in part, that an application for an order authorizing an eavesdropping device shall include the identity of the party to the expected conversation consenting to the use of an eavesdropping device, as well as the identity of the person, if known, whose conversations are to be overheard by the eavesdropping device. (See Ill. Rev. Stat. 1989, ch. 38, pars. 108A—3(a)(2)(c), (a)(2)(d).) Defendants argue that the eavesdropping application in the present case is defective because (1) it failed to name Brenda as a party to the conversation, and (2) the consenting party named in the application, Johnson, did not participate in the recorded conversation. The State replies that the application did not name Brenda as a participant and named Johnson rather than McLearin as the consenting party because the police did not know if Brenda would participate in the conversation and did not know if Brenda and O'Toole would speak directly to McLearin. The State's evidence at the hearing on defendants' motion to suppress the videotape showed that if Johnson could not arrange the meeting at the Redwood Inn, the police planned to wire him for sound and record his conversation with Brenda and O'Toole under the same authorization order. Accordingly, the State argues that the defects of which defendants complain were justified and insignificant.

In *People v. Ellis* (1984), 122 Ill. App. 3d 900, 904, 461 N.E.2d 646, 651, the court addressed technical violations of the eavesdropping statutes and wrote the following:

> "Where there is a failure to comply with statutory requirements *** suppression depends upon whether: (1) the particular safeguard is central to the legislative scheme of preventing abuses; (2) the purpose the particular procedure was designed to accomplish has been satisfied despite the error; and (3) the statutory requirement was deliberately ignored and, if so, whether the State gained any tactical advantage thereby."

In the present case, none of the above elements warranting suppression is present. We do not regard inclusion of *all*, as opposed to just *some*, of the names of the parties to the conversation to be overheard as central to the legislative scheme of preventing abuses. Further, the State's application presented the court with sufficient evidence about the expected crime to create reasonable cause for believing that defendants were about to commit a serious crime and that an eavesdropping device would obtain conversations pertaining thereto. The State did not deliberately ignore the statutory requirements by failing to include Brenda's and McLearin's names, nor did it gain any tactical advantage by omitting those names. Further, that omission could not have altered the trial court's determination that an eavesdropping device should be authorized.

Moreover, in light of the Illinois Supreme Court's decision in *People v. Beardsley* (1986), 115 Ill. 2d 47, 503 N.E.2d 346, we are not at all certain that the State even needed to obtain the eavesdropping order because the videotape recording in the present case may not have constituted eavesdropping under section 14—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 14—2). In *Beardsley*, the defendant, while seated in the rear of a police car, recorded a conversation between two police officers in the front seat of the car. (*Beardsley*, 115 Ill. 2d at 49, 503 N.E.2d at 348.) The State charged defendant with eavesdropping and a jury convicted him. The appellate court affirmed, but the supreme court reversed and wrote the following:

> "The primary factor in determining whether the defendant in this case committed the offense of eavesdropping is not *** whether all of the parties consented to the recording of the conversation. Rather, it is whether the officers/declarants intended their conversation to be of a private nature under circumstances justifying such expectation. ***

\*\*\*

\*\*\* [C]learly our eavesdropping statute should not prohibit the recording of a conversation by a party to that conversation *or* one known by the parties thereto to be present." (Emphasis in original.) *Beardsley*, 115 Ill. 2d at 54-56, 503 N.E.2d at 350-51.

The supreme court also indicated that the eavesdropping statute does not apply when a party to a conversation electronically records the conversation merely to provide a better, but less intrusive, record of the conversation than taking notes about it or testifying thereafter to its contents. (*Beardsley*, 115 Ill. 2d at 56, 503 N.E.2d at 351.) In so indicating, the supreme court seemed to approve the Federal standard that eavesdropping occurs only when a party uses an electronic device "to listen in on conversations it could not otherwise have heard." "In essence, the conduct at which the [eavesdropping] statute is aimed is that of listening in secret to what is said in private." *Beardsley*, 115 Ill. 2d at 55-56, 58, 503 N.E.2d at 351, 352, citing *Lopez v. United States* (1963), 373 U.S. 427, 439, 10 L. Ed. 2d 462, 471, 83 S. Ct. 1381, 1388.

In the present case, McLearin participated in the entire conversation depicted on the videotape. As such, the State videotaped the conversation not to listen to "[a] conversation[ ] [the State] could not otherwise have heard, but only to obtain the most reliable evidence possible of a conversation in which the [State's] own agent was a participant and which that agent was fully entitled to disclose." (*Beardsley*, 115 Ill. 2d at 56, 503 N.E.2d at 351, citing *Lopez*, 373 U.S. at 439, 10 L. Ed. 2d at 470, 83 S. Ct. at 1388.) Thus, in view of *Beardsley*, we doubt that the videotape in the present case even needed the support of an eavesdropping order to be admissible. This is an additional reason for holding that the trial court did not err in denying defendants' motion to suppress the videotape.

### B. *Juror Familiarity with the Case*

Defendants next argue that the trial court erred in not excusing several jurors for cause because they had read about the case in the newspaper prior to trial. In particular, some of the jurors had read that (1) defendants initially claimed to the police that they were only joking about hiring a hit man; (2) the State had videotaped defendants making their solicitation; and (3) the trial court had declared a mistrial and excused the initial jury chosen to try defendants in this case because some of those initial jurors had inadver-

tently seen defendant O'Toole being escorted out of the courthouse in handcuffs. We reject defendants' arguments.

A case such as this one in a small community will inevitably generate publicity, and no one should be surprised that potential jurors have read or talked about the case prior to trial. However, a prospective juror's familiarity with a case does not automatically disqualify that juror. (*People v. Britz* (1989), 185 Ill. App. 3d 191, 200, 541 N.E.2d 505, 511, quoting *People v. Taylor* (1984), 101 Ill. 2d 377, 386, 462 N.E.2d 478, 482.) Further, experience with such jurors teaches that the secondhand, often uninformed, and vague account of what some reporter *thinks* the evidence is will rarely affect a juror's ability to critically evaluate the evidence the juror *personally* receives in the courtroom, unless the news story reveals suppressed or unadmitted, prejudicial information. See *People v. Britz* (1988), 123 Ill. 2d 446, 467, 528 N.E.2d 703, 713 (trial court should not exclude jurors for cause due to exposure to media coverage unless the coverage is "extensive, close in proximity to the trial, and contain[s] prejudicial and inadmissible material"); *People v. Rogers* (1985), 135 Ill. App. 3d 608, 628, 482 N.E.2d 639, 653 (although exposure to other media coverage constituted no error or harmless error, fact that juror read article revealing suppressed evidence and shared that information with other jurors required reversal).

Prospective jurors frequently have vague impressions of the case they are called to hear, and these impressions are typically overcome as the jurors view the actual evidence in the case. Further, we note that all of the impanelled jurors said that what (if anything) they had read about the case would not prejudice their ability to weigh the evidence impartially. Despite defendants' assertions to the contrary, it does not "defy human belief" that the jurors could overcome their initial (and uninformed) impressions. Defendants' assertions are particularly groundless in the context of this case.

■ The first item of pretrial publicity that defendants claim allegedly prejudiced prospective jurors focuses on the pretrial publicity that defendants claimed their solicitation of McLearin was merely a joke. However, because defendants presented this defense at trial, we fail to see what prejudice they suffered. The worst that can be said of their posture at trial is that some jurors had a "sneak preview" of their defense. The pretrial publicity did not expose the jury to anything it did not receive during trial. See *Britz*, 123 Ill. 2d at 467, 528 N.E.2d at 713.

Defendants' second argument regarding excusing prospective jurors for cause is that the awareness of those jurors that the State had videotaped defendants' solicitation of McLearin unduly emphasized the videotape. We disagree. The publicity concerning the videotape would have posed a problem only if the trial court had suppressed it. (See *Britz*, 123 Ill. 2d at 467, 528 N.E.2d at 713.) Because the jurors viewed the videotape at trial, they could judge the videotape's evidentiary value for themselves. Defendants have failed to show how they were prejudiced because some jurors knew in advance of trial that the State possessed the videotape.

Finally, defendants argue that some prospective jurors knew that the trial court had dismissed the jury initially chosen to hear defendants' case because some of those initial jurors saw O'Toole in handcuffs as he was being escorted out of the courthouse. Defendants argue that the court should have excused for cause those prospective jurors who knew of the earlier mistrial and the reason therefor. However, the trial court did not need to dismiss the initial jury in the first place. (See *People v. Jackson* (1990), 195 Ill. App. 3d 104, 118, 551 N.E.2d 1025, 1033 ("even had the jurors been able to view defendant in the lockup area, no substantial prejudice resulted so as to deprive defendant of a fair trial").) The trial judge did so merely to take an extra (and unnecessary) precaution not to permit defendants to preserve what they claimed was reversible error at the earliest stages of the case. Because television and the media regularly depict criminal defendants in handcuffs, a juror's viewing a defendant in handcuffs can no longer be regarded as having a shocking effect on a prospective juror's sensibilities.

We want to emphasize the limited scope of our holding. We are not dealing with claims that jurors saw O'Toole shackled in the courtroom as the trial proceedings were taking place. Seeing a defendant in that condition might suggest to a juror that the judge believes the defendant too dangerous to sit unshackled during trial, thereby perhaps prejudicing the defendant in that juror's eyes. (See *Illinois v. Allen* (1970), 397 U.S. 337, 344, 25 L. Ed. 2d 353, 359, 90 S. Ct. 1057, 1061.) Instead, all that was involved in this case is that some members of defendants' initial jury saw O'Toole in shackles *outside the courtroom*. We find nothing prejudicial to defendants in the initial jury's having seen O'Toole this way. Moreover, whatever tenuous prejudicial effect that *seeing* O'Toole in shackles might have had on the initial jury, the second jury's merely *hearing* about it via coverage in the newspapers (and the mistrial the court ordered based thereon) certainly had no prejudicial effect whatsoever.

The trial court is in the best position to judge whether a juror can impartially weigh the evidence despite exposure to pretrial publicity. Thus, we will not reverse a trial court's finding that a juror is impartial unless it is against the manifest weight of the evidence. (*Britz*, 185 Ill. App. 3d at 201, 541 N.E.2d at 511.) In the present case, we find that the trial court did not abuse its discretion in refusing to excuse some of these jurors for cause because of pretrial publicity.

### C. *The Illinois Rule Requiring a Defendant To Admit a Crime before Pursuing an Entrapment Defense*

Defendants next argue that we should reconsider the Illinois rule that a defendant must admit a crime before asserting entrapment as an affirmative defense. (See *People v. Gillespie* (1990), 136 Ill. 2d 496, 501, 557 N.E.2d 894, 896.) In the present case, during the course of the prosecution's case in chief, the prosecutor moved to require defendants to choose as their defense either the nonexistence of the elements of the crime or entrapment. The prosecutor argued that the trial court could not determine the proper scope of relevancy when objections were made during defendants' cross-examination of the State's witnesses if the court did not know which of these two inconsistent defenses the defendants would pursue. The court agreed and required defendants to choose between the two defenses. Defendants then chose to abandon the entrapment defense.

The long-standing rule in Illinois requires a criminal defendant to admit the elements of a crime before asserting that the State entrapped him into committing the crime. (See *People v. Morgan* (1941), 378 Ill. 461, 471, 38 N.E.2d 760, 765.) This rule arose because it is inconsistent for a defendant to first deny that he committed a crime and then claim that the State entrapped him into committing the crime. (*Gillespie*, 136 Ill. 2d at 501, 557 N.E.2d at 897.) We note also that this rule allows both the court and counsel to determine the appropriate scope at trial of the relevancy of proffered evidence, as was done in this case.

In *Matthews v. United States* (1988), 485 U.S. 58, 62, 99 L. Ed. 2d 54, 60, 108 S. Ct. 883, 886, the United States Supreme Court held that a defendant in Federal criminal proceedings can request and receive jury instructions on the entrapment defense when the evidence could support that defense even if the defendant denies one or more elements of the crime. The Illinois Supreme Court in *Gillespie* held that *Matthews* did not alter the Illinois rule that a

defendant must admit the elements of a crime before claiming entrapment because *Matthews* was not based on the U.S. Constitution, but rather on the Federal Rules of Evidence and the Federal common law on instructing juries. (*Gillespie*, 136 Ill. 2d at 502, 557 N.E.2d at 897.) After concluding that the decision in *Matthews* did not bind Illinois courts, the supreme court expressly reaffirmed the Illinois rule on entrapment. *Gillespie*, 136 Ill. 2d at 503, 557 N.E.2d at 897-98.

Defendants argue that the Illinois Supreme Court's subsequent decision in *People v. Everette* (1990), 141 Ill. 2d 147, 565 N.E.2d 1295, indicates that the Illinois Supreme Court has had a change of mind on this subject. In *Everette*, the supreme court held that a homicide defendant could assert the inconsistent defenses that (1) he intentionally killed the victim but was acting in self-defense, and (2) his killing of the victim was an accident. (*Everette*, 141 Ill. 2d at 156-57, 565 N.E.2d at 1299.) Defendants thus argue that the supreme court has implicitly changed the Illinois rule that a defendant cannot assert the inconsistent defenses of entrapment and the nonexistence of one or more of the elements of the charged offense. We disagree.

In our judgment, *Everette* does not cast *Gillespie* or the Illinois rule on entrapment into doubt. The supreme court in *Gillespie* definitively (and recently) addressed the entrapment issue in this case, and that decision directly controls the result here.

### D. *The Prosecution's Use of Hearsay*

Defendants next argue that the trial court erred by allowing the State to elicit hearsay testimony from several of its witnesses. In particular, Johnson (the informant), Casagrande (a Vermilion County officer involved in the investigation), and McLearin (the Illinois State Police officer who posed as the hit man) all testified as to what each other said when initiating and planning the undercover investigation. All three also testified that they started the investigation because O'Toole had approached Johnson and asked him to kill someone. Defendants argue that the trial court should not have admitted these hearsay statements and that doing so constituted reversible error.

The Illinois Supreme Court has defined hearsay as follows:

> "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of

the out-of-court asserter." (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.)

Testimony of an out-of-court statement not offered for its truth, but rather offered to show or explain the course of conduct of another, does not constitute hearsay. (*People v. Cameron* (1989), 189 Ill. App. 3d 998, 1003-04, 546 N.E.2d 259, 263.) In such a case, the truth of the out-of-court statement is not at issue. However, out-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information. *Cameron*, 189 Ill. App. 3d at 1004-05, 546 N.E.2d at 263-64.

In *Cameron*, this court explained in detail how the out-of-court statements in that case revealed unnecessary and prejudicial information and described how they could have been edited so that they explained the police officers' course of conduct (to the extent it was appropriate and necessary that it be explained) but eliminated the unnecessary and prejudicial information. (*Cameron*, 189 Ill. App. 3d at 1004, 546 N.E.2d at 263.) We also stated that the trial court should have conducted a hearing out of the jury's presence to determine *both* the proper scope of the out-of-court statements and the need for the jury to hear them. (*Cameron*, 189 Ill. App. 3d at 1005, 546 N.E.2d at 264.) The failure of the trial court in the present case to conduct such a hearing and make appropriate findings has given rise to this issue on appeal.

■ In the present case, Johnson could properly testify that O'Toole asked him at the gas station to kill or find someone to kill Haney. This testimony constituted an admission by O'Toole and as such is not barred by the hearsay rule. (*People v. Shelton* (1990), 205 Ill. App. 3d 471, 479, 564 N.E.2d 226, 231.) Although confrontation problems often arise in joint trials when admissions of codefendants who do not testify are admitted, O'Toole did testify and was subject to cross-examination regarding his statements to Johnson. Furthermore, Johnson's testimony that O'Toole, on behalf of both himself and Brenda, asked Johnson to kill someone was admissible against Brenda because that testimony fell under the hearsay exception for statements of a coconspirator made in furtherance of the conspiracy. See *People v. Sanchez* (1989), 189 Ill. App. 3d 1011, 1017, 546 N.E.2d 268, 272.

However, the testimony of Casagrande and McLearin was improper when they testified that Johnson told them O'Toole had asked Johnson to kill or find someone to kill Haney. (See *Cameron*,

189 Ill. App. 3d at 1004-05, 546 N.E.2d at 263.) Although it was not improper for them to testify that Johnson told them he had spoken to O'Toole and that, based thereon, they set up an undercover sting operation, it was improper for them to testify to the detail they did—that Johnson told them that O'Toole had asked Johnson to kill or find someone to kill Haney.

However, we find the trial court's error in admitting this testimony falls far short of requiring reversal. First, the evidence against defendants at trial was truly overwhelming, including a videotape that depicted them soliciting an undercover agent to kill defendant Brenda's ex-husband, as well as evidence of O'Toole's asking Johnson's brother and father to kill Haney before O'Toole asked Johnson to do it. Second, both Johnson and O'Toole testified about their conversations at the gas station, thereby rendering the testimony of Casagrande and McLearin to the same effect merely cumulative and not prejudicial to defendants. See *People v. Arman* (1989), 131 Ill. 2d 115, 124, 545 N.E.2d 658, 662 ("When the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the conviction may be affirmed").

### E. *Impeachment of a Defense Witness Through That Witness' Criminal Record*

Defendants next argue that the trial court erred in allowing the prosecution to impeach a nonparty defense witness by using that witness' criminal record. C.L. Dye testified for defendants that he often employed O'Toole to help with roofing jobs. Dye also testified about certain expressions O'Toole commonly used as a part of his "bullshitting." He testified that O'Toole would often say, "Man, I'll kill you," or "I'm seriouser than a heart attack" (a statement O'Toole used in the videotape) when in fact he was not serious or just joking around.

The prosecution's cross-examination attempted to show that Dye testified for the defense only because he held an antiprosecution bias. The prosecutor did so by questioning Dye about his many prior arrests and convictions. When Dye admitted only two prior convictions and said he could not remember any others, the prosecutor abandoned his cross-examination with an insinuation that Dye had lied about his record.

The Illinois Supreme Court has held that the State may use evidence of a defense witness' prior arrests and charges to establish

an antiprosecution bias or motive to testify. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15, quoting *People v. Mason* (1963), 28 Ill. 2d 396, 400, 192 N.E.2d 835, 837.) However, in *People v. Hughes* (1988), 168 Ill. App. 3d 758, 761-62, 522 N.E.2d 1275, 1278, the appellate court held that a single pending charge is not sufficient to establish antiprosecution bias.

■ Defendants argue that here Dye's prior arrests similarly did not establish an antiprosecution bias. While the record suggests that Dye's criminal history apparently far exceeds that of the defense witness in *Hughes*, we need not resolve in this case whether any error in the prosecutor's handling of Dye's prior arrests and convictions was error. We conclude that the error, if any, falls far short of being a basis for reversal. (*Arman*, 131 Ill. 2d at 124, 545 N.Ed.2d at 662.) Dye's testimony could have had little (if any) impact at trial. The fact that O'Toole had previously used the expressions, "I'm seriouser than a heart attack," and "Man, I'll kill you," even in jest, does not come close to proving that he was merely jesting when he asserted, among other things, to McLearin that he was "seriouser than a heart attack" about killing Haney.

### F. *The Prosecutor's Closing Argument*

Defendants' last joint argument is that the prosecutor improperly referred to their prior convictions during his rebuttal closing argument and continued to do so even after the trial court sustained their objection. Citing *People v. Johnson* (1988), 170 Ill. App. 3d 828, 835, 525 N.E.2d 546, 551, defendants argue that this continuing line of improper argument after the trial court sustained their objection constitutes reversible error.

The statements at issue during the rebuttal portion of the prosecutor's closing argument are as follows:

"PROSECUTOR: [Defense Counsel argues that] these Defendants somehow aren't going to be able to [know] on their own that when they're asked about solicitation of murder for hire that maybe if they say... 'well... gee... we really didn't mean that,' that might be significant. Counsel would argue that both of these Defendants, *both of whom have previous felony convictions*, would be so naive as to have any idea what the import of—

THE COURT: Objection sustained.

DEFENSE COUNSEL RYAN: Objection.

THE COURT: It is improper argument. The jury is instructed to disregard that.

PROSECUTOR: *That they would not be able to know what the significance of 'I really didn't mean it,' would have.*" (Emphasis added.)

The prosecutor then proceeded to an entirely different argument.

Evidence of prior crimes is not admissible to prove that the defendant has the propensity to commit crime. (*People v. Walker* (1990), 194 Ill. App. 3d 864, 867, 551 N.E.2d 721, 723.) However, evidence of a defendant's criminal behavior is admissible for any other legitimate purpose, such as to prove *modus operandi*, motive, knowledge, intent, absence of mistake or accident, the defendant's state of mind, consciousness of guilt, absence of an innocent frame of mind or presence of criminal intent, circumstances or context of the defendant's arrest, circumstances of the crime charged that would otherwise be unclear, how an otherwise implausible fact relating to the crime charged arose, placement of the defendant in proximity to the time and place of the crime, identification of the weapon used in the crime, whether the crime charged was actually committed, opportunity or preparation, and dislike for or attitude toward the victim. (See *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292, 1296 (and cases cited therein).) Further, as noted in *Kimbrough*, this list of purposes "should not be taken to mean that these are the only purposes for which evidence of other crimes may be admitted." *Kimbrough*, 138 Ill. App. 3d at 485-86, 485 N.E.2d at 1296-97.

■ Although defendants argue that the prosecutor improperly used their prior convictions to prove their propensity to commit crime, the above quote from his closing argument shows that the prosecutor did no such thing. Defense counsel argued that defendants' initial statements to the police (that they were not serious) constituted honest, unfabricated explanations of their real intent. The prosecutor then responded that defendants were not so naive as defense counsel had argued, referring to their prior convictions as evidence of their lack of naivete. This limited reference to the defendants' prior convictions (which, we emphasize, were already properly before the jury to impeach defendants' credibility when they testified) did not constitute an improper use of their prior convictions. Accordingly, we find that any prejudicial effect of the prosecutor's argument was minimized by what the jury already knew about defendants' criminal records. *Arman*, 131 Ill. 2d at 124, 545 N.E.2d at 662.

Furthermore, even if the prosecutor's reference did constitute such an improper use of the defendants' prior convictions, the pros-

ecutor did not continue the error after the court sustained defense counsel's objection. On this record, we find the trial court's sustaining defendants' objection and instructing the jury to disregard the improper argument cured any error. See *People v. Eichelberger* (1989), 189 Ill. App. 3d 1020, 1033, 546 N.E.2d 274, 282 ("[g]enerally, when the court sustains an objection or admonishes the jury, any error resulting from the comment is cured").

### G. *O'Toole's Claim That the Court Used an Improper Factor When Sentencing Him*

Defendant O'Toole individually argues that the trial court improperly considered as an aggravating factor in sentencing him that his conduct threatened serious harm even though the threat of serious harm is an inherent part of the crime of solicitation of murder for hire. In *People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138, 1143, the supreme court held that a sentencing court should not consider as an aggravating factor an element that is inherent in the crime for which defendant is to be sentenced. However, a sentencing court need not unrealistically avoid any mention of such inherent factors, treating them as if they did not exist. (*People v. Willis* (1991), 210 Ill. App. 3d 379, 387, 569 N.E.2d 113, 118, quoting *People v. McPherson* (1985), 136 Ill. App. 3d 313, 317, 483 N.E.2d 592, 594.) In addition, although a particular factor might be inherent in a particular crime, the degree to which it is present might differ from occurrence to occurrence. (See *Saldivar*, 113 Ill. 2d at 269, 497 N.E.2d at 1143.) Thus, when reviewing a sentence in which the trial court allegedly considered an inherent factor of the crime as an aggravating factor in sentencing, an appellate court must determine (1) whether the alleged inherent factor can differ in degree from occurrence to occurrence of the same crime, (2) whether the court merely mentioned or actually considered the inherent factor when sentencing, and (3) whether the inherent factor served as such a primary factor in the defendant's sentence that the court would not have imposed the same sentence if the court had not improperly considered that factor. See *Saldivar*, 113 Ill. 2d at 269, 497 N.E.2d at 1143; *Willis*, 210 Ill. App. 3d at 387-88, 569 N.E.2d at 118-119 (and cases cited therein).

Solicitation of murder for hire differs from murder and manslaughter (the offenses considered in *Saldivar* and *Willis*) in that the harm to the victim has not yet occurred. Further, the degree of risk to the victim can vary greatly from case to case depending, for instance, on the resolve of the defendant to find some-

one to commit the murder, the resources available to the defendant, and the person the defendant solicited. Thus, unlike the fact of death, considered inherent in murder and manslaughter by *Saldivar* and *Willis*, the sentencing court in a solicitation of murder for hire case can appropriately consider the threat of serious harm that the defendant caused, *i.e.*, the nature and extent of his acts to effectuate the crime solicited, as an aggravating factor when imposing sentence. In the present case, the sentencing court did appropriately consider this factor when it said the following to the defendant at his sentencing:

> "I agree with the State in saying that the most dangerous part of this [crime] is that you would have kept asking people until you found somebody to do the job. Fortunately for Mr. Haney and fortunately for the public, you found someone that called the police and \*\*\* got somebody that was able to stop you in this plan to do away with Mr. Haney."

This statement recognizes that O'Toole's crime of solicitation of murder for hire could be viewed as worse than if he had solicited just one person. Accordingly, the trial court did not err in considering that defendant's conduct threatened serious harm when sentencing O'Toole.

We also note that the court considered many different aggravating factors in sentencing O'Toole, including his lengthy criminal record (10 prior felony convictions), the fact that he was on felony probation when he committed the present offense, and that the sentence was needed to deter others from committing the same offense. The court then imposed a sentence of 25 years—only 5 years over the statutory minimum and 15 years under the statutory maximum. (See Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2(b).) In view of defendant's miserable criminal record, we find no basis in this record for concluding that any sentencing error occurred.

### H. *Comparative Sentencing Between Defendants*

Finally, Brenda argues that the trial court disproportionately sentenced her to two more years of imprisonment than it gave O'Toole, even though O'Toole had a longer criminal record, O'Toole was on probation at the time of the offense, and O'Toole acted as the primary participant in the crime. We disagree.

We will not reverse a sentence unless the trial court abused its discretion in imposing that sentence. (*People v. Foster* (1990), 199 Ill. App. 3d 372, 392-93, 556 N.E.2d 1289, 1302-03.) Although defendants similarly situated should not receive grossly disparate

sentences, they do not have a right to have the same sentences. (*Foster*, 199 Ill. App. 3d at 393, 556 N.E.2d at 1303.) The court can base disproportionate sentences on the relative character and history of the codefendants, the degree of culpability, rehabilitative potential, and the criminal records of the codefendants. *Foster*, 199 Ill. App. 3d at 393, 556 N.E.2d at 1303; *Sanchez*, 189 Ill. App. 3d at 1018-19, 546 N.E.2d at 273.

■ When sentencing Brenda, the court noted that she had the most to gain by the crime and probably had come up with the idea. The court also noted that she had not suffered a history of psychological disorders like O'Toole and that she was a "much smarter individual than Mr. O'Toole." Based on this record, we certainly cannot say that the trial court abused its discretion.

Finally, although the transcript might indicate that O'Toole played the primary role in the solicitation because he did most of the talking to Johnson and McLearin, the trial court had the benefit in this case of viewing both defendants on videotape as they solicited McLearin to kill Haney. From this tape, it is apparent that Brenda was not bowing to O'Toole's willpower and ideas; instead, O'Toole, who did most of the talking, appeared to serve merely as Brenda's mouthpiece. She manifested her agreement by casually nodding at times and only entered into the conversation to correct O'Toole or to add or emphasize certain facts. This tape indicates that O'Toole did not play the primary role in the solicitation, but rather that the two acted in concert. As the trial court noted when sentencing Brenda, "The tape indicates that you, in a very, very clear, decisive, calculated manner sat down with Mr. O'Toole and discussed with him and with the officer the murder of John Haney." Our review of the videotape supports the trial court's characterization of Brenda. Therefore, because the trial court did not abuse its discretion, we affirm the sentence it gave to Brenda.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgments and sentences.

Affirmed.

GREEN, P.J., and LUND, J., concur.