**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230565-U

Order filed February 14, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0565 Circuit No. 21-CF-1366 |
| | ) | |
| DION L. WARE, | ) ) | Honorable Kenneth L. Zelazo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Davenport and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   (1) Defendant was provided the effective assistance of counsel. (2) The court did not consider an improper factor in aggravation when sentencing defendant.

¶ 2     Defendant, Dion L. Ware, appeals from his conviction and sentence for aggravated arson. Defendant argues that counsel provided ineffective assistance when they failed to propose a non-Illinois Pattern Jury Instruction (IPI) on the credibility of drug-addicted witnesses. Further, defendant argues that the Will County circuit court considered a factor inherent in his offense, improperly aggravating his sentence. We affirm.

I. BACKGROUND

¶ 4    On September 20, 2021, defendant was charged with aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2020)) stemming from a September 19, 2021, fire started at the residence of Sunny Jenkins while she was present within the residence. The case proceeded to a jury trial on March 15, 2023.

¶ 5    At trial, Jenkins testified that she purchased the residence in 2020. The house contained multiple bedrooms, which Jenkins rented. Jenkins and two tenants had bedrooms on the first floor of the home. Jenkins was introduced to defendant and initially refused to rent him a room. Approximately two weeks after meeting defendant, he arrived at her home, again asking to rent a room. At this point, Jenkins agreed to rent to defendant for a one-week trial period, and defendant moved into the loft.

¶ 6    On September 19, 2021, approximately two days after defendant had moved into the home, Jenkins, defendant, and Anthony Edwards were socializing in Jenkins's bedroom. The other two tenants were asleep in their bedroom. Jenkins indicated that the mood was initially positive, but that defendant minimally interacted with Edwards. She stated that defendant appeared to be jealous of Edwards. They smoked crack cocaine until they ran out.

¶ 7    At that point, Jenkins called a drug dealer to purchase four grams of crack cocaine. The dealer delivered the drugs to Jenkins's home, calling when he had arrived. Defendant overheard the phone call between Jenkins and the dealer, exited the residence, and retrieved the drugs. When defendant returned, Jenkins asked him about the drugs, and he gave them to her. An argument ensued between Jenkins and defendant. Jenkins indicated that she was upset because she paid for the drugs and defendant had taken them. Jenkins weighed the drugs after defendant gave them to her and determined it was a lesser amount than what she had ordered. Jenkins

confronted defendant about the missing drugs, yelled at him, and told him to leave. Jenkins testified that, after this confrontation, she and Edwards returned to her bedroom. Sometime later, defendant entered Jenkins's bedroom and began pouring a full bottle of liquid "all over [her], all over [her] bed, all over the floor, and he lit it on fire."

¶ 8    The fire began on the bedroom floor and covered most of it. Jenkins climbed out of her bedroom window. She reentered the residence through the back door. She located Edwards and called the police. Jenkins and Edwards attempted to extinguish the fire with water from the laundry-room sink. The police arrived and extinguished the flames. Photographs of Jenkins's fire-damaged bedroom were admitted and published to the jury. Jenkins spoke with the police several times. She did not tell the police that she was using crack cocaine or that she dealt drugs. She informed the police that defendant started the fire and provided a description of him. While she was speaking with officers, defendant called Jenkins. She could not remember specifically what he said but indicated that his statements were threatening.

¶ 9    On cross-examination, Jenkins admitted that she lied to police when she told them she had just met Edwards for the first time on September 19, 2021. Jenkins had met Edwards prior and had a romantic relationship with him. Edwards had spent the night with her the night before the fire. Jenkins was not using drugs at the time of trial but had been using drugs when she spoke with the police on September 19, 2021. Jenkins gave conflicting answers during her testimony on how much money she sold a gram of crack cocaine for and testified that she could not recall how much crack cocaine she purchased on September 19, 2021, or how much she paid for it. Jenkins testified that her drug dealer told her that he had given her drugs to someone else, but that she did not see defendant or anyone else receive the drugs. She told the police that she had never seen

3

defendant use drugs. Jenkins indicated that she never told either the State or the police that she had lied.

¶ 10     Edwards testified that on September 18, 2021, he was consuming alcohol with two tenants in Jenkins's home. After drinking, Edwards woke up in a minivan outside of Jenkins's residence. At that point in time, Edwards was suffering from substance-abuse issues. He admitted to consuming pills, heroin, cocaine, marijuana, and alcohol during this period. Edwards knocked on Jenkins's door and was greeted by Jenkins. He testified that on September 18, 2021, he met Jenkins for the first time. He had known who she was but did not know her well. After meeting, they drank alcohol and smoked crack cocaine. Defendant was present. Edwards indicated that defendant was talkative and friendly. He observed defendant flirting with Jenkins. She did not reciprocate defendant's interest, and he became irritated and aggressive. Edwards spent the night with Jenkins in her bedroom.

¶ 11     On September 19, 2021, Edwards, Jenkins, and defendant smoked crack cocaine that was provided by defendant. When they ran out, Jenkins called her drug dealer to purchase more. When the dealer arrived, Edwards was with Jenkins in her bedroom. Defendant was standing in the doorway. Jenkins told defendant to retrieve the drugs. Edwards indicated that defendant "politely went and got it." Defendant returned with the drugs 15 minutes later, which seemed unusual to Edwards because defendant was going to the driveway and that should have only taken a couple of minutes. Upon defendant's return, instead of handing Jenkins the drugs, he opened the package and began splitting it into three portions. Jenkins became angry, called defendant a thief, and demanded "the rest of her stuff." Defendant responded that "she got what she had coming and he didn't have anything else for her." Jenkins called the dealer to ask what

4

amount he had provided to defendant. Defendant denied being given any more than he had. No one weighed the drugs.

¶ 12  Eventually, Jenkins stopped arguing with defendant and purchased more drugs. Jenkins demanded that defendant leave. He refused, stating that he had equal right to be in the home. Defendant was angry and said he would not be disrespected by anyone, and "he would die for his respect." Edwards attempted to calm defendant down. Jenkins repeatedly told defendant to leave. Defendant told Edwards that he would be smart to leave the residence. Ultimately, defendant left. Edwards felt concerned for Jenkins's safety. He testified that defendant had been making threats and said, "[h]e was going to kill her and he was going to fix that bitch." Edwards indicated that defendant was very animated and aggressive, kicking the back door off its hinges.

¶ 13  Approximately 30 minutes later, defendant returned to Jenkins's residence with another man. Defendant continued to threaten Jenkins and told Edwards to leave because he was "fittin' to burn that bitch down." Defendant retrieved two bottles of liquid from the man and attempted to douse Jenkins with the contents. Edwards knocked one bottle out of defendant's hands. Defendant began pouring the liquid all over the bedroom. The liquid smelled like gas or lighter fluid. Defendant lit a napkin on fire and threw it, causing the bedroom to quickly ignite. Edwards found a bucket of mop water in the laundry room and attempted to extinguish the flames. Edwards testified that Jenkins exited through the bedroom window and reentered the house from the back door. Edwards and Jenkins were eventually able to extinguish the fire. Edwards suffered minor burns.

¶ 14  Edwards called the police. Afterwards, defendant called Jenkins. Defendant was screaming and Edwards recognized his voice. Defendant screamed that "he was going to come back and finish the job, she ain't dead, she will be." Defendant called Edwards shortly thereafter

5

to inform him that he was nearby and would be coming back to "finish the job." Defendant again urged Edwards to leave the residence. Edwards did not tell the police about any drug dealers or drug usage because he did not want to get into trouble. For the same reason, he avoided calling the police until defendant had acted on his threats. Edwards indicated that by the time he spoke with the police, he was no longer feeling the effects of the drugs he consumed. Edwards indicated that, at the time of trial, he was taking Suboxone to treat his addiction. He testified that Suboxone did not impede his ability to recall events. The State admitted and published photographs of the two bottles that contained the fluid that was used to set the fire and the damaged back door. Defense counsel cross-examined Edwards on discrepancies between his testimony and statements he made to the police and his drug use.

¶ 15 Officer Jacob Close of the Crest Hill Police Department testified that on September 19, 2021, he was dispatched to Jenkins's residence. He met with Jenkins and Edwards who provided him with a summary of the incident and defendant's name and description. Close observed the fire damage to Jenkins's bedroom. He located a plastic bottle near the entrance to the bedroom. Close also observed the back door off its hinges. Close was standing near Jenkins when she received the phone call from defendant. Jenkins informed Close that defendant was calling and activated the speaker. Close heard a male voice say, "he was going to come back and finish the job." Jenkins asked defendant what he meant, and he responded, "I'm going to show you later." Close began speaking with defendant and asked his location. Defendant replied that he was approximately three or four blocks from Jenkins's residence. Close and another officer went to the described location but were unable to locate defendant. Close did not have any difficulty understanding either Jenkins or Edwards. They did not appear to be under the influence of drugs

at that time. When Close returned to the scene, he had Jenkins and Edwards call defendant's phone number to assist another officer in identifying defendant.

¶ 16    Officer Timothy Kaplar of the Crest Hill Police Department testified that he observed a man who matched the description he had been provided of defendant, walking approximately three or four blocks from Jenkins's residence. Kaplar approached the man, whom he identified in open court as defendant, and asked his name. Defendant did not provide it and asked if Kaplar was looking for someone. As the conversation continued, Kaplar noticed that defendant had a red cell phone. Kaplar spoke with officers on the scene and learned that the suspect also possessed a red cell phone. Kaplar asked Close if someone could call the number associated with the suspect's cell phone. Once they placed the call, Kaplar observed defendant look at his cell phone, as if to see who was calling, then put the phone down. Defendant was placed under arrest. A subsequent search of his person revealed a red cell phone, a lighter, and a napkin.

¶ 17    Forensic scientist Luke Lemming testified as an expert in the analysis of latent fingerprints. He performed an analysis of latent fingerprints found on one bottle retrieved from Jenkins's bedroom. He compared the fingerprints to defendant, Jenkins, and Edwards and found no match. Lemming testified that it was possible for a person to touch something and not leave fingerprints. It was also possible for latent fingerprint residue to be evaporated due to excessive heat.

¶ 18    Firefighter Brend Hullinger testified as an expert in arson and fire investigations. Hullinger and another firefighter began their investigation on the exterior of Jenkins's home. They observed a broken window and a door that appeared to have been forced open. They removed parts of the flooring in Jenkins's bedroom, along with portions of the mattress and a took a sample of the fluid located inside one bottle to test for flammable liquid. They observed

7

pour patterns on the carpet, "which would be the process of pouring a flammable liquid on to a material and then ignite it." Hullinger testified that pour patterns are generally found in intentional fires. The bottle, the flooring, and the mattress all tested positive for gasoline. Hullinger concluded that the fire was intentionally set by pouring gasoline onto the floor of the bedroom and igniting it with an open flame.

¶ 19        After the State rested, defendant moved for a directed verdict, which was denied. During closing arguments, defense counsel argued at length about the unreliability of Jenkins and Edwards as witnesses. Counsel highlighted discrepancies in their testimony and statements to the police and a lack of physical evidence tying defendant to the crime. The court provided the jury with IPI Criminal, No. 1.02 (approved Apr. 30, 2021), which instructed jurors that they were the judges of the believability of the witnesses and of the weight to be given to their testimony in light of the witness's "ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony." The jury found defendant guilty of aggravated arson.

¶ 20        Defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, a new trial, which argued, *inter alia*, that Jenkins was so incredible that it raised a reasonable doubt. On September 13, 2023, the court denied the motion and proceeded to a sentencing hearing. In aggravation, the State argued that the court could consider that defendant's conduct caused or threatened serious harm. It elaborated that defendant chose to use gasoline and fire to attempt to burn Jenkins alive. In doing so, he threatened harm to Edwards and the other tenants in the residence as well as the first responders who "put their lives on the line to put out fires and rescue any individuals." Further, the State highlighted defendant's criminal background which exposed him to an extended-term sentence of 6 to 60 years' imprisonment. Defendant had five

prior felony convictions which all involved offenses against other individuals and was on mandatory supervised release (MSR) at the time of the instant offense.

¶ 21    In mitigation, defendant's friend testified that defendant was a good man who was in a bad situation. He introduced defendant to Jenkins because she had rooms available, and defendant needed somewhere to live. He testified that he knew Jenkins to be a "[s]cheming, conning, drug dealer" who lied throughout her trial testimony. Defendant's sister also testified that she and defendant were close. She discussed their childhood, defendant's attempts at rehabilitation, and his mental health conditions. She expressed a belief that defendant would not be a danger if he were properly medicated and rehabilitated from a drug addiction and that she would do her best to help him achieve that if given the chance. Defendant made a statement in allocution discussing his poor childhood, drug addiction, and mental health struggles.

¶ 22    On October 5, 2023, the court sentenced defendant to 25 years' imprisonment. In doing so, the court stated that it considered, among other things: "the trial evidence, the presentencing investigation report, the history, character, and attitude of the defendant, the evidence and arguments of counsel and *** the statutory means in aggravation and mitigation with due regard for the circumstances of the offense." In aggravation, the court noted defendant's criminal history was particularly aggravating, including the instant offense being committed while defendant was on MSR. It noted that defendant's criminal history made him eligible for extended-term sentencing. It also considered defendant's statement in allocution.

¶ 23    Defendant filed a motion to reconsider his sentence. At the hearing on the motion, defendant argued that this was not a case where an entire building burned down and, in fact, the occupants were able to extinguish the flames themselves without the aid of first responders. Defendant argued that there was no testimony of any injury to any individual. Further, defendant

highlighted Jenkins's apathy regarding the proceedings, evidenced by a contempt citation for failure to appear pursuant to a subpoena and her failure to provide restitution paperwork as requested. The State argued that the circumstances of this aggravated arson were not about the property but that defendant wanted Jenkins dead. Defendant attempted to pour gasoline on her specifically and light her on fire. The court reiterated that it considered all the appropriate factors in aggravation and mitigation.

¶ 24    The court denied the motion to reconsider, stating that it had reassessed and again considered all the evidence that it had previously and, "with due regard for the circumstances of the offense," it considered the following in aggravation:

> "Pursuant to 730 ILCS 5/5-5-3.2, relevant factors in aggravation include the defendant's conduct causing or threatening serious harm, the defendant being convicted of a felony that was committed while he was on a period of [MSR], the defendant being convicted of a felony after having previously been convicted of the same or similar class felony or a greater class felony, and that the conviction occurred within ten years after the previous conviction ***. Also, the defendant had at least five previous felony convictions in his criminal background. Furthermore, the defendant was on [MSR] after serving a ten-year sentence in the Department of Corrections for a previous Class X felony, conviction for armed robbery when the defendant committed *** aggravated arson in this case."

Defendant appeals.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, defendant contends that trial counsel was ineffective for failing to request a non-IPI jury instruction concerning the effects of drug abuse on the credibility of witnesses

10

where Jenkins and Edwards, the State's two key witnesses, were drug addicts who were on drugs at the time of the offense. Further, defendant argues that the court impermissibly considered that defendant's conduct caused or threatened serious harm, which is a factor inherent in the offense of aggravated arson.

¶ 27                          A. Ineffective Assistance of Counsel

¶ 28         "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *People v. Domagala*, 2013 IL 113688, ¶ 36. A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced defendant. *Id.* ¶ 30. To establish deficient performance, defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 29         "The function of jury instructions is to convey to the jury the law that applies to the evidence presented." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). "Parties must be allowed to cross-examine witnesses about drug use, but a trial court is not required to instruct the jury on the unreliability of testimony by drug addicts." *People v. Reed*, 405 Ill. App. 3d 279, 288 (2010). A

11

specific instruction on drug addiction is unnecessary where evidence of that addiction has been presented to the jury, allowing them the opportunity to appropriately weigh the credibility of the witness. See *People v. Steidl*, 142 Ill. 2d 204, 238 (1991) ("Jurors do not leave their common sense behind when they enter court, and even in the absence of cautionary instructions they will ordinarily be aware of the factors which make some witnesses unreliable." (Internal quotation marks omitted.)); see also *People v. Daniels*, 287 Ill. App. 3d 477, 486 (1997) (where defendant was allowed to argue at length to the jury that the witness's drug addiction affected his credibility, "no specific jury instruction as to a drug addict's testimony was needed because the general instruction regarding jurors weighing witness credibility was sufficient").

¶ 30    Here, even if, *arguendo*, counsel was ineffective for failing to request the instruction, defendant was not prejudiced. Evidence of Jenkins's and Edwards's drug addiction and drug use on the date of the offense was covered extensively throughout the trial. The State elicited information about their drug use and addiction during their direct examinations. Defense counsel also cross-examined both witnesses at length on the subject. Additionally, defense counsel repeatedly attacked discrepancies in their testimony, highlighting lies and omissions from both witnesses. Because the jury was provided with copious evidence of both witnesses' history of substance abuse and drug use on the day of the offense with which they could properly assess the witnesses' credibility, and was appropriately instructed in accordance with IPI Criminal No. 1.02, no reasonable probability exists that the outcome of the trial would have been different had counsel asked for a non-IPI instruction. Accordingly, defendant's claim of ineffective assistance of counsel fails.

¶ 31                                    B. Sentencing

12

¶ 32    Defendant argues that the court erred in considering an aggravating sentencing factor that was inherent in the offense. Defendant acknowledges that he failed to preserve this issue but asks that we review it under the plain-error doctrine. In the alternative, defendant argues that counsel was ineffective for failing to object to this error.

¶ 33    The plain-error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that his claims of error are reversible under the second prong. The first step of the plain-error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 34    "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense." *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). However, sentencing courts are not obligated to avoid any mention of such factors as if they do not exist. *People v. O'Toole*, 226 Ill. App. 3d 974, 992 (1992). Some criminal conduct may warrant a harsher penalty than other conduct punishable under the same statute. *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986). Determination of the appropriate penalty to be imposed must be based on the circumstances specific to each individual case, "including the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *People v. Hunter*, 101 Ill. App. 3d 692, 694 (1981). "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements

13

by the trial court." *People v. Larson*, 2022 IL App (3d) 190482, ¶ 29. "[W]hen a circuit court considers an improper factor in sentencing a defendant, the court's sentencing decision must be vacated and the case remanded for resentencing unless it is clear from the record that the improper factor was so insignificant that its consideration did not result in a greater sentence." *People v. Young*, 2022 IL App (3d) 190015, ¶ 23.

¶ 35 Section 5-5-3.2(a) of the Unified Code of Corrections lists factors in aggravation, which "shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5-8-1." 730 ILCS 5/5-5-3.2(a) (West 2022). The first factor in aggravation is that "the defendant's conduct caused or threatened serious harm." *Id.* § 5-5-3.2(a)(1). The court explicitly stated that it found consideration of this factor relevant. Generally, that defendant's conduct caused or threatened serious harm is inherent in the offense of aggravated arson. *People v. Gonzalez*, 243 Ill. App. 3d 238, 245 (1993). This is because aggravated arson requires that a defendant "know that one or more persons are present therein," which would expose them to the possibility of serious harm. 720 ILCS 5/20-1.1(a)(1) (West 2020) As the legislature already considered the elements of the offense in fashioning appropriate penalties, those same elements cannot be used as an aggravating factor at sentencing. *People v. Rissley*, 165 Ill. 2d 364, 390 (1995).

¶ 36 However, the circumstances of the instant case go beyond simply knowing that others were in the residence and disregarding the potential harm that may occur to them as a result. Here, the nature and extent of defendant's conduct is significantly more grave where the evidence established that defendant entered Jenkins's bedroom, intending to douse her in gasoline, light her on fire, and kill her after an argument.

14

¶ 37　　　The court specified that it considered the evidence, the arguments of counsel, and the circumstances of the offense when imposing defendant's sentence. The State argued this point at both the initial sentencing hearing as well as the hearing on defendant's motion to reconsider. After Jenkins escaped, defendant continued to threaten her that he would come back and "finish the job." Consideration of the gravity of the targeted and violent nature of defendant's conduct was proper when determining the seriousness of the offense.

¶ 38　　　Further, it is clear from the record that the court heavily weighed defendant's prior criminal history when determining his sentence. The court's comments at both hearings focused almost exclusively on defendant's prior criminal record and the fact that he committed this offense while on MSR for armed robbery. Even if we were to find that the court considered an improper factor, the record establishes that the court afforded it little weight. Accordingly, the court did not err in sentencing defendant. Because no error occurred, "neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from [defendant's] forfeiture." *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179.[1]

¶ 39　　　　　　　　　　　　　III. CONCLUSION

¶ 40　　　The judgment of the circuit court of Will County is affirmed.

¶ 41　　　Affirmed.

---

[1]During the pendency of the appeal, the supreme court issued its decision in *People v. Johnson*, 2024 IL 130191, ¶ 92, holding that a sentencing court's consideration of an inapplicable aggravating factor may not be reviewed under the second prong of the plain-error analysis. Since we have resolved the issue by finding no error occurred, this case does not change our analysis.