2020 IL App (4th) 190909

NO. 4-19-0909

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 1, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| JAMES D. JONES, | ) | No. 17CF1758 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Knecht and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    In the Macon County circuit court, a jury found defendant, James D. Jones, guilty of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(1)(A) (West 2016)). The court sentenced him to imprisonment for 30 years. Defendant appeals on four grounds.

¶ 2    First, defendant challenges the sufficiency of the evidence. Looking at all the evidence in the light most favorable to the prosecution, as we are required to do, we conclude that a reasonable trier of fact could find the elements of unlawful delivery of a controlled substance to be proven beyond a reasonable doubt.

¶ 3    Second, defendant complains that, in the jury trial, the State presented an abundance of evidence that he had committed offenses other than the offense with which he was charged, thereby implicitly inviting the jury to find him guilty because he supposedly was a bad person and,

as such, just the sort of person who would commit the charged offense. We find no abuse of discretion in the admission of the other-crimes evidence, which had relevance other than as proof of defendant's propensity to commit crime.

¶ 4      Third, defendant objects that, in her closing argument to the jury, the prosecutor made inflammatory remarks that compromised the fairness of his trial. These untimely objections are, we hold, procedurally forfeited, and because we find no clear or obvious error in the complained-of remarks by the prosecutor, the doctrine of plain error provides no relief from the forfeiture.

¶ 5      Fourth, defendant accuses his trial counsel of rendering ineffective assistance by omitting to object to the prosecutor's closing argument and thereby causing the procedural forfeiture. From our finding of no clear or obvious error, it follows that omitting to object fell within the wide range of reasonable professional assistance.

¶ 6      Therefore, we affirm the judgment.

¶ 7                              I. BACKGROUND

¶ 8      The information had one count: that, on December 13, 2016, in Macon County, defendant unlawfully delivered heroin to Ebonie Dixon. See *id.*

¶ 9      The jury trial was in March 2019. The State's evidence tended to show that, on December 13, 2016, Dixon, who was under surveillance by the police, met defendant in the parking lot of Best Buy in Forsyth, Illinois. Immediately after this meeting, the police pulled Dixon over for failing to use a turn signal. After questioning Dixon about a suspicious bulge in the crotch of her pants, a female police officer persuaded Dixon to pull out and hand over two bags of heroin. One bag was 19.7 grams, and the other bag was 0.2 grams. Dixon agreed to further cooperate with the police. She divulged to the police that she had just bought the heroin from defendant. The State

presented extensive other-crimes evidence that defendant had an ongoing business of supplying heroin to lower-level sellers such as Dixon.

¶ 10        That is a bird's-eye view of the evidence in the jury trial. More specifically, the witnesses testified substantially as follows.

¶ 11        A. Dixon's Testimony

¶ 12        1. Her Criminal Record

¶ 13        Dixon, age 31, had prior convictions of drug-induced homicide, burglary, possession of a stolen motor vehicle, and conspiracy to commit bank fraud. She also had two prior convictions of forgery and six prior convictions of various types of theft, including identity theft and retail theft.

¶ 14        2. Her Drug Transactions With Defendant—the Fifth and

Latest Transaction of Which Resulted in Her Arrest

¶ 15        The delivery charged in this case was the fifth time that Dixon bought heroin from defendant, whom she knew as James Cooper. She had been buying heroin from him—and only from him—since August or September 2016. He was a contact saved in her phone under the names "Rocko Decatur," "Rocko D," and "D2." They arranged their meetings by phone and drove to whatever meeting place they agreed on. For the fifth and latest transaction—the one charged in this case—Eric Turner and Amanda Oden rode along with Dixon from Springfield, Illinois, to Forsyth. Originally, the transaction was supposed to take place in the Walmart parking lot, but defendant decided there were too many police in that area. He told Dixon to meet him, instead, in the Best Buy parking lot in Forsyth. Defendant was driving a white Chevrolet Camaro. He pulled up next to Dixon in the Best Buy parking lot, where Dixon bought 22 or 23 grams of heroin from him for $1800.

¶ 16        After this fifth purchase from defendant, Dixon was on her way back to Springfield, where she lived, when the police pulled her over for failing to use a turn signal. The heroin she had just bought from defendant was in a cupholder in her car. Before the police officer walked over to her car, Dixon hid the bags of heroin under her pants, in her vagina. At first, she denied to the police that she possessed any drugs. Eventually, after being questioned about the bulge in her pants, she pulled out the bags of heroin and handed them over to a female police officer. Dixon was arrested and was taken to the police station, where, according to her testimony, she selected a photograph of defendant from among multiple photographs.

¶ 17        Dixon had not been charged for the bags of heroin that the police seized from her in the traffic stop.

¶ 18            3. Cooperation Agreements With State and Federal Authorities

¶ 19        In the traffic stop, after the police discovered the heroin on her, Dixon agreed to cooperate with the police. That was why she had not been charged in Macon County for the heroin the police seized from her in the traffic stop. She had signed a cooperation agreement with federal authorities, too, giving her federal immunity from prosecution for all of the heroin she had bought from defendant from August to December 2016.

¶ 20        But there already had been five cases pending against Dixon for other crimes, including drug-induced homicide, and she had entered into plea agreements in four of those five cases. When it came to those five cases, Dixon denied hoping to receive any benefit for her cooperation in defendant's case. She further denied telling two detectives on October 13, 2016, that she hoped her cooperation would keep her out of jail or that the more she cooperated, the more consideration she would receive on her sentences. She denied that Detective Russell Lehr had told her that, if she gave him a lot of information, she would receive a lot of consideration. She denied

- 4 -

having the understanding, or being told, that "there were individuals who cooperated who got probation as a result of their cooperation."

¶ 21   Referring to a transcript of the interview of October 13, 2016, defense counsel asked Dixon if she had asked Lehr: " [']So people that have been put in this situation as a woman with kids have they ever not been to jail or got probation or anything?['] " Then, according to defense counsel (apparently paraphrasing the transcript), Lehr answered that "he ha[d] seen people in that situation and in similar situations who ha[d] done outstanding jobs who [were] superstars and they walk[ed] away from things." Defense counsel asked Dixon: "Was that your understanding of the conversation?" Dixon answered: "No, ma'am. *** I've never brought my kids into any type of situation dealing with my crime, no."

¶ 22   4. Was Defendant Dixon's Only Supplier?

¶ 23   Dixon bought heroin from defendant to resell to others. She claimed that, in the period of August to December 2016, she never bought heroin from anyone other than defendant. She admitted, however, that her phone contacts included not only defendant but also Amanda Jus (otherwise known as Amanda Oden), Sherry, and Nick. But the latter three people, Dixon insisted, were just people she knew, not suppliers of drugs.

¶ 24   Dixon, according to her testimony, also knew no fewer than three people by the name of Tone. She had received many calls and texts from a man by that name. One of the texts from him read: "8 grams equal 2 Gs." Dixon explained:

> "Yeah, but listen these text messages he was talking about something prior to way
>
> before he just so happened to went to jail, came back, talking about some money,
>
> needed help with bond money, and what I supposed to owe him months prior, and
>
> months, months prior to this.

Q. Okay. And so 8 grams equals 2 Gs isn't about drug transactions?

A. I mean, that's what he was texting me, yes."

¶ 25 Defense counsel also asked Dixon:

"And do you see in that text message he says to you, [']Okay then you owe me a band. You gave me 360. Okay. Then you owe me 635,['] do you see that?

A. Yes.

Q. Is that about drug transactions?

A. No, it's about money. Because also it says, [']Okay that's 680. I let you borrow 135 on top of the 50.['] It's all about money transaction.

Q. So in that particular text a band doesn't mean—

A. Drugs.

Q.—heroine [*sic*]?

A. No, it means money."

¶ 26 Dixon denied ever buying drugs from someone named Amenia Hernandez and denied even knowing anyone by that name. Dixon admitted being acquainted with someone named Menia (not to be confused, apparently, with Amenia), but Dixon did not know Menia's last name. Defense counsel asked if the following exchange occurred between Dixon and Lehr on December 13, 2016:

"Detective Lehr says to you, Amenia, and you say Amanda—Amenia Hernandez. And one of the detectives asked you where she lives. She lives in Decatur, you say, and then the detective says, What's she doing? And you say, She sells her heroine [*sic*]. She sells crack. I just bump with her some salt, is that the statement that you made?

A. No, ma'am.

Q. No, you didn't say that to those officers?

A. They might have miscommunicated we might've because I don't—salt is not even my way of talking."

¶ 27   To be clear on this point, defense counsel asked Dixon if she ever bought 100 grams of heroin or any drugs at all from somebody named Amenia Hernandez. Dixon answered in the negative. Defense counsel then asked her:

"And then we've already established December 13, 2016[,] you gave an interview, correct?

A. Uh-huh.

Q. And did you say to detective Mansfield, [']I bought almost 100 grams,['] Mansfield says, [']From her, when was that?['] And you tell Mansfield[,] ['O]ver the summer.[']

A. Yes. But you're saying—you keep saying [']from her.['] If you're talking about a middle person[,] or are you talking about directly from her because it's a middle man.

Q. I'm not saying anything. I'm repeating what you said.

A. Because you keep saying Amanda Hernandez. I'm never—her name is not Amanda Hernandez.

Q. It's—It's—okay. So, in fact, you—James Cooper wasn't your only supplier; isn't that correct?

A. At the time he was my only supplier.

Q. Okay. So not Amenia, Menia, Ms. Hernandez, she wasn't a supplier of your's [*sic*]?

A. No, ma'am.

Q. And not Mr. Tone?

A. No, ma'am."

¶ 28            5. How Long Had Dixon Known Defendant?

¶ 29      After questioning Dixon about her identification of defendant, defense counsel asked her:

"You stated yesterday that you met Rocko in August or September; is that right?

A. Yes. I stated between end of September between August, yes.

Q. And on December 13, you actually had told the officers that you'd only known James Cooper for a month; is that correct?

A. A few months.

Q. On December 13, 2016[,] you were interviewed by officers, your truthfulness was important, correct?

A. Yes, ma'am.

Q. And you were asked by [D]etective Lehr, [']How much—how long have you been messing with James Cooper for?['] And you responded, [']I've been dealing with him for almost a month now[']?

A. Yes. We've been only known each other for a few months. We met, conversated probably at the end of September beginning of August. We finally met in October.

Q. Okay. So you started—met Mr. James [*sic*] for the first time somewhere between August and November?

A. Between August and December somewhere it would have been—

Q. You met Mr. Jones sometime between August and December?

A. Yes.

Q. Okay. And that—

A. We went through initial phone conversations first before we ever even met."

¶ 30    6. What Contact Name Did Dixon Give Defendant in Her Phone?

¶ 31    Defense counsel asked Dixon about the contact name she had assigned to defendant in her cell phone:

"On that day, October 16, 2017, did [D]etective Callaway ask you, [']Remember what you had saved, what contact name you used for him?['] And did you answer, [']Probably be James or James Money. I know it'd be just James.['] Did you say that?

A. I don't remember saying that."

¶ 32    7. How Much Heroin Did Dixon Buy From Defendant in the First and Second Transactions, and How Much Money Did She Still Owe Him?

¶ 33    Dixon testified that, the first time she bought heroin from defendant, in August or September 2016, she bought 10 grams. She denied telling Callaway on December 13, 2016, that she bought only two grams of heroin from defendant in the first transaction.

¶ 34    Dixon further testified that, the second time she bought heroin from defendant, she bought 10 grams. She denied telling Callaway it was 20 grams.

¶ 35    Dixon also denied telling the police on December 13, 2016, that she owed defendant $1700 "for that recent transaction." Instead, she told the police that she had "paid [defendant] for that recent transaction" and that the "[o]nly money [she] ever owed him was the $250," which she had paid by MoneyGram.

¶ 36                    B. The Testimony of Carnessa Jackson

¶ 37    Carnessa Jackson (Jackson) testified that she had been charged in Macon County with possessing heroin with the intent to deliver it. She had made a deal with the State. Her part of the deal was to plead guilty in her own case and to testify truthfully in defendant's case. In return, she would receive two years' probation. Also, she had received immunity from the federal government in exchange for testifying truthfully in this case.

¶ 38    Jackson testified that in August 2016, when she was living at 1345 East Wellington Way, Apartment C, in Decatur, she met defendant and began dating him. He lived in an apartment on East Fitzgerald Road but soon began overnighting with her every other weekend.

¶ 39    In November 2016, the same month when Jackson learned where defendant lived, he bought her a Volkswagen Passat. Because the Passat had a defective wheel, it was seldom driven. Instead, the Passat was shifted between various parking lots. Jackson began to suspect that defendant was stashing drugs in the Passat, using it as a roving storage container, so to speak. He had told her he was employed at Ds Auto Imports in Springfield, but eventually she figured out that he had another source of income: he was a drug dealer.

¶ 40    Jackson began riding along with defendant in his black truck or his white Camaro when he went to do drug deals. At first, she did not see any drugs. Apparently, he kept the drugs hidden on his person and took them into the buyers' houses. Soon, however, defendant became less careful about keeping the drugs hidden from Jackson. She began seeing what he was selling

when he was selling it. He even began allowing her to sell some of the heroin herself, half a gram a time for $60. They pooled their earnings from the drug-trafficking business.

¶ 41      In November 2016, defendant told Jackson that someone named Ebonie Dixon had sent her a MoneyGram in the amount of $150. (Documentation showed that the amount actually was $250.) It was waiting to be picked up at Walmart. Jackson did not know what the $150 was for or who Dixon was.

¶ 42      On December 20, 2016, Jackson drove the Passat to Walmart to get a tire fixed. Defendant was supposed to meet her at Walmart, but he never showed up. Jackson drove back to her apartment. Upon her arrival, the police were there with a search warrant. The police confiscated her iPhone as well as the flip phone she had been using to receive orders for heroin. The police searched the Passat and found drugs. Jackson did not know how the drugs had got in the Passat. She had seen drugs as defendant made sales, but he had never revealed to her where his stashes were. In their search of the apartment, the police found bottles of inositol and Dormin (agents for "cutting" or diluting heroin and cocaine). And in the kitchen, they found a Dairy Queen bag.

¶ 43      Jackson testified that she had thrown the Dairy Queen bag into the trash. She denied putting any drugs in the Dairy Queen bag. But, as she was informed, the Dairy Queen bag did indeed contain drugs. Initially, on December 20, 2016, wanting to protect defendant because she loved him, Jackson represented to the police that the drugs belonged to her. She told the police that, "to the best of [her] memory[,] *** there was 40 grams of cocaine and 100 grams of heroin[ ] at [her] apartment that [she] knew of." Three days later, after further reflection, Jackson decided that protecting defendant was not worth ruining her life. She then "talk[ed] to the police about this defendant and his drug distribution." All the drugs she had been selling belonged to him.

¶ 44 Other than Jackson and defendant, Jackson's best friend, Tatiana, had a key to Jackson's apartment. But Tatiana did not live there. In the apartment were "various men's clothing and shoes." To whom they belonged Jackson did not know, nor how they got there. The clothes were too big for defendant.

¶ 45 C. The Testimony of Scott Giovanelli

¶ 46 On December 20, 2016, Scott Giovanelli, a special agent with the United States Drug Enforcement Administration (DEA), participated in the search of 1345 East Wellington Way, Apartment C. In the kitchen cabinet, he found a Dairy Queen bag, inside of which were plastic Baggies containing what he believed to be a controlled substance. Because the warrant was not a DEA warrant, Giovanelli called a Decatur detective, James Callaway, to examine the bag and to collect it as potential evidence. Giovanelli identified a photograph of the Dairy Queen bag sitting in the kitchen cabinet and a photograph of the inside of the bag. He denied tampering with the contents of the Dairy Queen bag. He merely had opened the bag and looked inside it.

¶ 47 D. The Testimony of Everett Nation

¶ 48 Everett Nation was a detective employed by the city of Taylorville, Illinois. He also was an inspector with the Illinois State Police Central Illinois Enforcement Group. On December 20, 2016, he assisted with the search of 1345 East Wellington Way, Apartment C. His task was to look for evidence and, if he found any, to call Callaway to collect it. In the kitchen cabinet, Nation found a digital weighing scale and a bottle of inositol. He identified photographs of those items where they sat in the kitchen cabinet.

¶ 49 E. The Testimony of Tyler Mansfield

¶ 50 1. Surveillance at Best Buy

¶ 51        Tyler Mansfield was a special agent with the DEA. On December 13, 2016, he assisted with the surveillance of the Best Buy parking lot in Forsyth. He was in a "take away position." That is, he was positioned at a nearby Circle K gas station so that, when Dixon left the Best Buy parking lot, he could follow her and keep track of her until either a traffic stop was effected or the surveillance was terminated. Mansfield saw Dixon leave the Best Buy parking lot in her Buick Enclave. Then, according to a radio transmission, she stopped at Circle K. Mansfield was not at a vantage point that enabled him to see Dixon's car at the gas station. When Dixon left Circle K, Mansfield followed her until the police pulled her over in the westbound lane of Interstate 72.

¶ 52        2. Preparatory Surveillance at 1345 East Wellington Way

¶ 53        Also, on December 20, 2016, Mansfield assisted with executing the search warrant at 1345 East Wellington Way, Apartment C. Before executing the search warrant, Mansfield and other police officers took up positions outside the apartment building and did some preparatory surveillance. Mansfield was with Callaway. Around 10:38 a.m., they saw a black truck pull into the parking lot of 1345 East Wellington Way.

¶ 54        Three people were in the black truck: defendant, Jackson, and a child. All three exited the truck. Defendant went to another vehicle in the parking lot while Jackson and the child went inside the apartment building. Defendant got into the other vehicle and remained in it for a while. Then he got out and went into the apartment building.

¶ 55        Around 11:30 a.m., defendant, Jackson, and the child came out of the apartment building. Defendant got into the black truck. Jackson and the child got into the second vehicle, which defendant had entered minutes earlier. Both the truck and the second vehicle left the parking lot.

¶ 56                    3. The Discovery of Drugs in the Volkswagen

¶ 57         At 11:35 a.m., as the police were searching Apartment C, Jackson and the child returned in a Volkswagen. Jackson was arrested. Pursuant to the search warrant, the police searched the Volkswagen. Mansfield learned that crack cocaine was found in the Volkswagen. Callaway put the cocaine in a Decatur police evidence bag and gave it to Mansfield, who in turn sealed it in a DEA evidence bag and shipped it to the DEA laboratory in Chicago "to determine if there was a cocaine base or determine the difference between powder cocaine and crack cocaine." Mansfield identified People's exhibit No. 20 as the sealed DEA evidence bag bearing his signature and containing the cocaine found in the Volkswagen.

¶ 58                       F. The Testimony of Chad Ramey

¶ 59                          1. Surveillance at Best Buy

¶ 60         Chad Ramey was a Decatur detective. At 10:50 a.m. on December 13, 2016, he was in the parking lot between Best Buy and Dollar Tree in Forsyth, keeping an eye out for a white Buick Enclave. He saw the Enclave arrive and park in the middle of the parking lot, at some distance from where most of the people were. At 11:40 a.m., a white Chevrolet Camaro pulled into the parking lot and parked near the Enclave. Ramey recognized the Camaro as defendant's car. A black woman got out of the driver's side of the Enclave and into the passenger side of the Camaro. For about 25 minutes, no one got out of the Camaro. Then the black woman exited the Camaro and returned to the driver's seat of the Enclave. Both vehicles left the parking lot.

¶ 61         Ramey followed the Enclave while other unmarked units followed the Camaro. The Enclave pulled into a gas station and sat there for about five minutes. Ramey did not recall that anyone got into or out of the Enclave at the gas station. Nor did anyone approach the Enclave. At about noon, the Enclave left the gas station, went south on United States Route 51, and then turned

onto the entrance ramp of westbound Interstate 72. When turning onto the ramp, the Enclave failed to use its turn signal. Ramey radioed other units, notifying them of the traffic violation.

¶ 62                    2. The Search of 3435 East Fitzgerald Road, Apartment No. 2

¶ 63          At 8:30 a.m. on December 20, 2016, Ramey was surveilling the apartment building at 3435 East Fitzgerald Road. A white Camaro was parked in the front, the same Camaro that Ramey saw on December 13, 2016, at Best Buy. Upon being notified that defendant had been taken into custody, Ramey assisted a Decatur detective, Jeff Hockaday, in executing a warrant to search 3435 East Fitzgerald Road, Apartment No. 2. Hockaday brought some keys to the apartment that he had obtained from Callaway. No one was in the apartment at the time of the search.

¶ 64          Ramey and Hockaday found a digital weighing scale on a shelf in the kitchen. On the kitchen counter was a box of sandwich bags, some of which had their corners cut off. Also, there was a bottle of inositol in the kitchen. In a bedroom, they found a small bag of cannabis. The apartment had three mirrors: two hanging in the living room and one hanging in the bedroom. United States currency was stuck into the upper corners of these mirrors, and—what struck Ramey as "weird"—the currency appeared to have been soaked in blood (although, Ramey admitted on cross-examination, the stains had not been tested to confirm that they were indeed blood).

¶ 65          Other than the small bag of cannabis, however, no narcotics were found in Apartment No. 2. No contraband was found in the Camaro, either.

¶ 66          But the Camaro had an unusual feature that Ramey had never seen in a car before. A video screen for a rearview camera was mounted in the dashboard, but this camera was not just for backing up. The camera was on at all times when the car was in operation, not only when the car was in reverse. That way, the driver could always see what was behind.

¶ 67                    G. The Testimony of Jonathan Jones

¶ 68                          1. Surveillance at Best Buy

¶ 69        Jonathan Jones was a Decatur police officer assigned to the street crimes unit. The morning of December 13, 2016, he participated in the surveillance of the Best Buy parking lot. Jones was parked nearby, at Walmart, when he saw a white Camaro go east on Ash Street. Jones followed. The Camaro turned south onto Martin Luther King Drive. Then it turned east onto Mound Road. Then it turned south onto Portage Place. And that was the end of Jones's part in the surveillance.

¶ 70        2. Surveillance of Vehicles at the Wellington Way Apartment Building

¶ 71        On December 20, 2016, Jones assisted with the surveillance of 1345 East Wellington Way. Specifically, his task was to surveil vehicles. During the surveillance, he was notified that some vehicles were on the move. At North Portage Place and East Mound Road, Jones saw a black Dodge Ram pickup truck and a black Volkswagen that he believed to be a Passat. These two vehicles were travelling north together on Portage Place, heading toward Mound Road. They turned west onto Mount Road and then north onto Martin Luther King Drive. Then both vehicles turned west onto Ash Street. It was the same route that Jones had seen on December 13, 2016, only in reverse.

¶ 72        The Volkswagen pulled into the parking lot of Walmart and parked there and waited. No one got out of the Volkswagen, and no one approached it. After a while, the Volkswagen left the Walmart parking lot and returned to the Wellington Way apartment building, using the same route as before.

¶ 73                H. The Testimony of Jeff Hockaday

¶ 74        Hockaday was a Decatur detective assigned to the street crimes unit. During the search of 1345 East Wellington Way, Apartment C, Callaway gave Hockaday a set of keys.

Hockaday took the keys to 3435 East Fitzgerald Road, Apartment No. 2, where another search warrant was to be executed. Hockaday there turned the keys over to Ramey.

¶ 75                                    I. The Testimony of Steve Young

¶ 76            Steve Young was a Decatur police officer assigned to the street crimes unit. While the search of the apartment at 1345 East Wellington Way was being performed, Young went to the scene of a traffic stop. A black Dodge Ram was stopped in the northbound lane of United States Route 51 and Interstate 72, near the overpass. The keys were in the Ram. Young drove the Ram back to 1345 East Wellington Way. He did not search the Ram. Nor did he tamper with the contents of the Ram or add to them.

¶ 77                                    J. The Testimony of Brian Hickey

¶ 78            Brian Hickey was a Macon County deputy sheriff, and on December 20, 2016, he participated in the search of 3435 East Fitzgerald Road, Apartment No. 2. He found, on the kitchen counter, an open box of sandwich bags. He notified Ramey of this discovery, and Ramey collected the box of sandwich bags, which Hickey identified in court (People's exhibit No. 33).

¶ 79            Later that same day, Hickey participated in the search of Apartment C, 1345 East Wellington Way. In this search, he looked inside a box of tampons in the bathroom. In the box was a clear Baggie containing a brown powdery substance that Hickey believed to be heroin. He notified Callaway, who was the case agent.

¶ 80            In a bedroom of Apartment C, Hickey found United States currency. In a closet in the bedroom, he found some documents, several of which had defendant's name on them but none of which bore the address of 1345 East Wellington Way.

¶ 81            In a hall closet, Hickey found a bottle of Dormin. He notified Callaway of all these discoveries.

¶ 82		The items that Hickey had found were marked as exhibits, and Hickey identified them in court.

¶ 83		K. The Testimony of Callaway

¶ 84		1. Surveillance at Best Buy and Return to the Police Station

¶ 85		Callaway, a Decatur detective, helped with the surveillance of the Best Buy parking lot on December 13, 2016. Around 10:50 a.m., he followed defendant's white Camaro from Best Buy to 1345 East Wellington Way. When defendant arrived at the Wellington Way address, defendant got out the Camaro and walked away.

¶ 86		Callaway then returned to the Decatur police station, where he participated in the interviews of Dixon and her passengers, Turner and Oden. A Springfield detective, Lehr, gave Callaway the heroin that had been seized from Dixon. Callaway identified the bags of heroin in court (People's exhibit Nos. 1 to 4).

¶ 87		2. Preparatory Surveillance at 1345 East Wellington Way and the Arrest of Jackson

¶ 88		At 10 a.m. on December 20, 2016, Callaway and Mansfield began surveillance at 1345 East Wellington Way while Ramey did surveillance at 3435 East Fitzgerald Road.

¶ 89		At 10:38 a.m., Callaway saw a black Dodge Ram pull into the parking lot of 1345 East Wellington Way and park there. Defendant, Jackson, and a child got out of the Ram. Jackson and the child entered the apartment building. Defendant walked over to a black Volkswagen, which already was parked on the lot and was unoccupied. He stood by the Volkswagen for a moment and then got into it. He started the engine of the Volkswagen as if to warm the car up—Callaway inferred that defendant started the engine because the headlights of the Volkswagen came on. Defendant remained in the Volkswagen for about five minutes. Then he got out and walked into the apartment building.

¶ 90    At 11:22 a.m., defendant, Jackson, and the child came out of the apartment building. Jackson and the child got into the Volkswagen, and defendant got into the Ram. Both vehicles left the Wellington Way parking lot and headed west.

¶ 91    At 11:30 a.m., the police began searching 1345 East Wellington Way, Apartment C, pursuant to the search warrant. At 11:35 a.m., during the search, Jackson and the child returned in the black Volkswagen. The police took Jackson into custody.

¶ 92            3. Callaway as Evidence Custodian and Interviewer

¶ 93    Callaway's responsibilities in the search of Apartment C were to interview any individuals there and to collect evidence that other police officers found in the search. Using photographs and exhibits, Callaway described the discovery and seizure of the cocaine and heroin in the Dairy Queen bag, the digital weighing scale, the bottles of inositol and Dormin, the $165 in cash from the backpack, the heroin in the tampon box, and the heroin and cocaine in the center console of the Volkswagen. The purpose of his testimony, it seems, was to establish a chain of custody for those items.

¶ 94    In addition, Callaway described the documents found in Apartment C. Several of the documents had defendant's name on them with the address of 3435 East Fitzgerald Road or 1349 Wellington Way, Apartment C (instead of 1345 East Wellington Way, Apartment C).

¶ 95    While Apartment C was being searched, defendant was brought there. He gave Callaway his date of birth. He stated that he lived at 3435 East Fitzgerald Road and that he was employed at Ds Auto Imports. He gave Callaway a set of keys, which Callaway gave to Hockaday with instructions to pass them on to Ramey. Defendant had $1382 in his pants pocket and $1000 in his wallet. Clipped onto his belt was a Samsung smartphone.

¶ 96　　　　A search of the black Dodge Ram pickup truck revealed two more Samsung phones, a lease agreement for a Chevrolet Camaro in defendant's name, and other documents with his name on them.

¶ 97　　　　　　　　　　　4. MoneyGram Records

¶ 98　　　　People's exhibit No. 39 was a receipt that Callaway had received from Walmart's loss prevention officer, Scott Gardner. It showed that on November 19, 2016, Dixon made a MoneyGram transfer of $250 to Jackson.

¶ 99　　　　　　　　　　L. The Testimony of Russell Lehr

¶ 100　　　　Lehr was a Springfield detective. On December 13, 2016, at 3:30 a.m., he installed a global positioning system (GPS) tracking device on Dixon's Buick Enclave. At 10:27 a.m., he received an alert that the car was moving. He saw on his computer that the car was heading east on Interstate 72. He wanted to try to pick up physical surveillance of the car. Ramey agreed to help. Lehr got in his car and met up with Ramey at the PetSmart parking lot on Koester Drive in Forsyth, near Best Buy.

¶ 101　　　　Lehr then got into Ramey's car, and the two of them watched Dixon's car, which was parked in the parking lot. After a while, a white Camaro parked in front of the Enclave. Dixon got out of her Enclave and into the passenger side of the Camaro. Soon afterward, Dixon got out of the Camaro and back into her Enclave. Then the Enclave left and went to a gas station that was next to PetSmart. The white Camaro then also left. Lehr kept surveillance on the Enclave with Ramey. Turner got out of the Enclave and went into the gas station. About five minutes later, Turner emerged from the gas station and got back into the Enclave. Lehr and Ramey followed the Enclave back out onto Interstate 72 as it headed west toward Springfield.

¶ 102    A deputy with the street crimes unit pulled the Enclave over. Lehr received word over the phone that about 20 grams in heroin had been found on Dixon's person. A Decatur K-9 police officer, Chad Larner, gave the suspected heroin to Lehr in an evidence bag. Lehr drove Dixon's Enclave back to the Decatur Police Department, taking the heroin with him. He then gave the heroin to Callaway. Lehr denied changing the contents of this evidence bag in any way. The heroin remained in the evidence bag untouched.

¶ 103    Because it was "common" for the police "to use street[-]level dealers to get a higher[-]level drug supplier," Lehr sought Dixon's cooperation. She agreed to cooperate and, consequently, was released.

¶ 104    On cross-examination by defense counsel, Lehr testified that Dixon had asked him about the possibility of getting probation for her cooperation. She seemed very interested in that idea and wanted some benefit for her cooperation. No photographic lineup was put together and presented to her. Maybe just one photograph of one person was shown to her, not multiple photographs. Lehr had asked Dixon how long she had been "messing with James Cooper." She answered that she had been messing with Cooper for about a month, something she twice told Lehr. She told Lehr that she owed "Cooper" approximately $1750. Also, Dixon told Lehr about somebody in Decatur named Amenia Hernandez from whom Dixon had purchased significant amounts of drugs. Lehr could not remember if Dixon said it was 100 grams, but he remembered that Dixon, according to her statement, had purchased a substantial amount of drugs from Hernandez. Dixon told Lehr that, the first time she bought drugs from this person named James Cooper, it was 2 grams and that, the second time she bought drugs from him, it was 10 grams.

¶ 105    M. The Testimony of Chad Larner

¶ 106    On December 13, 2016, a Decatur police officer, Larner, responded to the scene of a traffic stop. He ran his drug-sniffing dog around a white Buick Enclave and found a hypodermic syringe inside. Detective Jonathan Roseman of the Macon County Sheriff's Department gave Larner the heroin found on Dixon, and Larner in turn gave the heroin to Lehr.

¶ 107    Larner also participated in the search of the Volkswagen Passat at 1345 East Wellington Way. In the center armrest or console of the Passat, he found a plastic bag containing a brown powdery substance as well as a plastic bag containing a white powdery substance. In the courtroom, he identified photographs of these bags where they were stashed in the center console. He also found a smartphone and a flip phone in the Passat.

¶ 108    In a subsequent search of the Dodge Ram, he found two flip phones and some documents.

¶ 109    N. The Testimony of David Dailey

¶ 110    A Decatur police officer, David Dailey, testified as an expert in the field of narcotics distribution.

¶ 111    The prosecutor began by asking Dailey how cocaine was imported into the United States. Dailey answered:

"The majority of cocaine is being brought in from South America into the country, United States, on the southwest border. Once those larger shipments are brought into the United States across the southwest border, they are broken down into smaller shipments and distributed to what we refer to as source cities.

Those are cities that have a large population which in turn gives you a large customer base, therefore, the smaller shipments would be broken down and sent out to the individual source cities across the country. So source cities for Decatur

currently for cocaine are Chicago and Indianapolis, Indiana. Once those shipments arrive at the source city, they are then somehow either transported from the source city to Decatur or people from Decatur would go over to the source cities and transport the drugs back themselves."

¶ 112        At this point, defense counsel objected on the ground of irrelevancy. She suggested: "I don't think we need to understand the entire history of drug distribution in order to understand this case." The circuit court agreed and asked the prosecutor "how long [he was] going to go on with this." "Not very long," the prosecutor promised. The court urged the prosecutor to "move it along."

¶ 113        The prosecutor then asked Dailey where heroin came from. Dailey answered: "Again, the majority of heroin is coming up through Mexico on the southwest border distributed to source cities where it's broken down into smaller shipments where it would eventually hit the smaller communities such as Decatur."

¶ 114        Next, the prosecutor asked Dailey: "How do people use cocaine?" Dailey answered:
"Powder cocaine is most commonly consumed by snorting it through the nasal passages. It can also be diluted with water and then injected with a syringe.

Q. And what—what about crack cocaine, what is that?

A. Crack cocaine in order to have crack cocaine, you first have to have powder cocaine. Powder cocaine is hydrochloride, salt. Powder cocaine cannot be smoked. It can only be snorted or injected. In order to convert it to crack cocaine, there is a process where an individual would add water and maybe some baking soda to it to remove the acid from it at which time it goes back to its base form a solid state which would be smokeable."

¶ 115    After hearing this answer, defense counsel again objected on the ground of irrelevancy. The circuit court ruled: "Right. I mean, let's get to the point."

¶ 116    Next, the prosecutor asked Dailey: "How do people use heroin?" Dailey answered: "Heroin is most commonly either injected with a syringe or it is snorted or it can be smoked where an individual would place the substance on a piece of tinfoil, apply heat to it, and inhale the smoke."

¶ 117    The direct examination then shifted to more obviously relevant topics, such as the dosage units of powder and crack cocaine and the street values of all the heroin and cocaine seized in December 2016. Dailey opined that the drugs the police had seized in this case had been possessed with the intent to deliver them. Dailey based this opinion on the weight of the drugs, which he characterized as distribution amounts; the amount of money found on defendant and the denominations of the currency; the cutting agents and the digital weighing scales found in the two apartments; the multiple cell phones; defendant's use of multiple addresses; the sandwich bags with corners clipped off; the lack of evidence that either defendant or Jackson had been using the drugs personally; and the evidence of changing phone numbers frequently. Dailey further explained that it was common for drug transactions to take place in public parking lots or other public places, where it was possible to blend in.

¶ 118                                    O. Stipulations

¶ 119    The parties entered into a stipulation that a chemist, if called, would testify that People's exhibit Nos. 1 and 2, which were recovered from Dixon, totaled 19.9 grams of heroin.

¶ 120    There was a further stipulation as to the testing and weights of the controlled substances recovered from all the searches, including 19.7 grams of heroin, 54.1 grams of cocaine,

19.8 grams of diphenhydramine, 1.1 grams of cocaine, 159.3 grams of heroin, 7.3 grams of heroin, and 3.3 grams of heroin.

¶ 121                                    P. The Testimony of Cadrekia Jackson

¶ 122        The State rested, and the first witness for the defense was Cadrekia Jackson (Cadrekia). Whereas Jackson (an unrelated neighbor) lived in Apartment C at 1345 East Wellington Way, Cadrekia lived downstairs, in Apartment A. She had seen people spend the night in Jackson's apartment, including a woman named Tatiana and Tatiana's boyfriend, a heavyset man named Adam.

¶ 123        Cadrekia was familiar with the residents of the apartment complex where she lived, Carriage Home Apartments. Tiffany Freeman, a next-door neighbor, was defendant's sister. Cadrekia knew defendant, too, and regarded him as a friend. She saw defendant five or six days each week. They hung out together, watching TV in Cadrekia's apartment. They were just friends, not physically intimate. She had never seen defendant go into Jackson's apartment.

¶ 124                                    Q. The Testimony of Amanda Oden

¶ 125        Oden testified that Dixon used to be her drug-dealer back when Oden was still using drugs. On December 13, 2016, Oden telephoned Dixon, asking for more drugs. Dixon picked her up in Springfield, and they drove to Decatur. On the way, Dixon made a deal with Oden: Dixon would give Oden some drugs if Oden agreed to use a Best Buy credit card to buy some cell phones. The Best Buy credit card had the name of Dixon's mother on it, Heather Reid.

¶ 126        Upon their arrival in Forsyth, Oden went into Best Buy but could not bring herself to fraudulently buy the cell phones as she had agreed to do. So, she returned to Dixon's car without the cell phones. Dixon was incensed and made Oden return the drugs that Dixon had given her on the way to Decatur. The syringe that the police found during the traffic stop, on the rear passenger

floorboard of Dixon's car, belonged to Oden. Because it was hard to shoot up heroin in a moving car, Oden never got a chance to use the heroin before having to give it back to Dixon.

¶ 127        It was Oden's testimony that she never saw anything happen in the parking lot with Dixon and another vehicle. Oden denied being in the Enclave when another vehicle pulled up and Dixon got out of the Enclave and into the other vehicle. Oden was not there at the time.

¶ 128        Oden admitted that on December 13, 2016, when she was in the Decatur police station, she was questioned by Mansfield, Lehr, and Callaway. If, indeed, Oden told those detectives that Dixon had "picked up her drugs in the parking lot of Best Buy because [that was] where the person came"—something Oden did not remember telling them—Oden would have been lying, she explained, in an attempt to get herself out of trouble. Or, as Oden put it in her trial testimony, she would have been "spinning a web."

¶ 129        On cross-examination, Oden also was confronted with her statements to the detectives that she knew a drug dealer who was a cousin of her paramour, Mike, and who worked at Ds Auto World. Oden again testified that she would have been "spinning a web" and that she really did not know who Mike's cousin was. She denied being able to recognize defendant, sitting at counsel's table.

¶ 130        In its case in rebuttal, the prosecution played the impeaching portion of Oden's recorded statement to the police.

¶ 131                        R. The Testimony of Breanne Hassinger

¶ 132        Breanne Hassinger testified that in December 2016 Jackson babysat her children and that she knew Jackson's friends, Tatiana and Adam.

¶ 133        According to Hassinger, defendant helped her sell a Buick Riviera in December 2016, and they split the sales proceeds evenly. Defendant's share was $4500.

¶ 134 Hassinger was presented with People's exhibit No. 43, a certified copy of a title history of the car. It showed that she was still the owner of the Riviera. Hassinger explained that she had not sent in the stub from the title to the Secretary of State.

¶ 135 S. The Prosecutor's Closing Argument

¶ 136 In the State's closing argument, the prosecutor told the jury:

"And we also learned it's very profitable, that's why people like Ebonie Dixon sell drugs. With very little effort, very little you put into it, you can make a lot of money living off putting this poison out on the streets and everybody else's misery, the user's misery. You don't have to go to work 40 hours plus a week like most of the rest of us do."

¶ 137 Also, the prosecutor made the following argument to the jury:

¶ 138 "And, ladies and gentlemen, momentarily you'll be asking yourself a very important question. And that question is: Is [defendant] just the most unluckiest guy in the world or is he just guilty? Is he a fly in the world of windshields or does he look guilty in this case because he is guilty."

¶ 139 II. ANALYSIS

¶ 140 A. Evidence of Other Crimes

¶ 141 The State charged defendant with delivering heroin to Dixon on December 13, 2016. The only charged offense was his unlawful delivery of a controlled substance to her on that date. See 720 ILCS 570/401(a)(1)(A) (West 2016). Nevertheless, in the jury trial, not only did the State present evidence of the charged offense (defendant's delivery of heroin to Dixon on December 13, 2016), but the State presented extensive evidence that defendant committed additional drug offenses on other dates. For instance, Dixon testified that defendant had sold her

- 27 -

heroin on four previous occasions. Also, Jackson testified that in November 2016 defendant began supplying her with heroin and cocaine to sell. Apartment C, which defendant seems to have frequented and in which his papers were found, had stashes of heroin, with inositol and Dormin for cutting it. Apartment 2 had the clipped corners of Baggies, apparently packaging for drugs. Heroin and cocaine were found in the Volkswagen soon after defendant entered the Volkswagen and started it up. Then there was the MoneyGram from Dixon to Jackson. Through all this additional evidence, the State suggested to the jury that defendant was, by occupation, a drug dealer and that, as such, he committed drug offenses on many occasions, not just on the occasion that the charging instrument alleged.

¶ 142       Thus, in the jury trial, the State adduced evidence of drug offenses by defendant in addition to the drug offense with which he was charged. Was it legally permissible for the State to do so? It depends on what the State's purpose was in proving the uncharged offenses. Except as allowed by various sections of the Code of Criminal Procedure of 1963 (see 725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2016)), none of which apply to this case, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In other words, evidence of other crimes, wrongs, or acts by someone is inadmissible if the purpose of such evidence is to prove that the person has a bad character and to suggest that the person must have behaved badly because the person has a bad character. Propensity evidence generally is inadmissible.

¶ 143       Evidence of other crimes, wrongs, or acts is admissible, however, for purposes other than proving a propensity to commit crime. Rule 404(b) provides: "Such evidence may *** be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident." *Id.* As the phrase "such as" signals, that list is not exhaustive. See *id.*

¶ 144       But the purpose other than propensity, whatever it is, must move the truth-seeking enterprise forward because only relevant evidence is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). To put it differently, evidence is relevant if it tends to move the needle of probability on any factual proposition that logically matters, given the issues in the case.

¶ 145       The circuit court concluded that evidence of defendant's commission of drug offenses on dates other than December 13, 2016, was relevant to prove his "intent" and "system of operation." If only one of those purposes survives scrutiny, that is enough for us to uphold the court's ruling. See *People v. Spyres*, 359 Ill. App. 3d 1108, 1113-14 (2005). We see no significant difference between this case and *Spyres*, in which the appellate court upheld the admission of other-crimes evidence to prove a common design, or "system of operation," to distribute cannabis.

¶ 146       In *Spyres*, the charge of which the jury found the defendant guilty was cannabis trafficking (720 ILCS 550/5.1(b) (West 2002)). *Spyres*, 359 Ill. App. 3d at 1109. The date of the charged offense, it appears, was June 22, 2001. That was when a shipment of cannabis from Red Bluff, California, arrived at the defendant's residence in Decatur, Illinois, with the understanding that the defendant was to pass the cannabis along to a drug trafficker named Pelaiz. *Id.* at 1110-11. In the trial, in addition to presenting evidence of this charged offense of June 22, 2001, the State presented evidence of other, uncharged drug offenses by the defendant, offenses he committed on previous occasions. For example, Staples employees identified store documents

showing that, on at least 10 occasions before the June 22, 2001, arrest, packages from Red Bluff were shipped to the defendant's Decatur address. *Id.* at 1111. Also, an Illinois state trooper testified that in May 2001 he pulled the defendant over for a traffic violation and found, in the defendant's car, a half-pound of cannabis, hand scales, $278 in cash, and photographs of the defendant posing with weapons and large amounts of cannabis. *Id.*

¶ 147    On direct appeal, the defendant in *Spyres* challenged the admission of the other-crimes evidence. *Id.* at 1113. The appellate court agreed with the circuit court, however, that the other-crimes evidence was relevant and admissible to prove a common design (*id.*), "an ongoing effort [by the defendant] to bring cannabis into Illinois for distribution" (*id.* at 1114). The previous shipments from Red Bluff to the defendant's Decatur residence—his previous commissions of the charged crime—"were relevant to whether [he] was engaged in the crime charged." *Id.* The previous shipments "demonstrated how [the] defendant went about the business of cannabis trafficking." *Id.* Even the evidence that the Illinois state trooper found in his May 2001 traffic stop of the defendant—the half-pound of cannabis, the hand scales, and the large amount of cash— "supported the State's theory that in June 2001, [the] defendant was engaged in cannabis trafficking, the charged offense." *Id.* The June 2001 shipment was one element, one part, of the defendant's common design to bring cannabis into Illinois for distribution.

¶ 148    Instead of "common design," the circuit court in the present case used the phrase "system of operation" in its limiting instructions to the jury. Although "common design" is the more accurate term, the appellate court in *Spyres* found no reversible error in the use of the phrase "system of operation." See *id.* at 1112. Defendant in the present case had an ongoing "system," so to speak. He had a feeder operation, a wholesale business, in which he supplied heroin to lower-level sellers. That defendant was "in the business" (*People v. Rucheinski*, 224 Ill. App. 3d 118,

- 30 -

124 (1991))—that he was an established supplier of heroin and cocaine—arguably had some tendency to make it more probable than it otherwise might have been that the heroin the police seized from Dixon on December 13, 2016, had come from her immediately preceding meeting with defendant in the Best Buy parking lot. See Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 149         Even if the other-crimes evidence was relevant to a purpose other than proving a propensity by defendant to commit crime—such as a common design—he complains that the other-crimes evidence was "unduly cumulative," resulting in a mini-trial on uncharged offenses. Though relevant, "evidence may be excluded if its probative value is substantially outweighed *** by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Defendant calculates that, "[o]f the 220 pages of direct testimony, 120 pages, or 54%, concerned the other-crimes evidence." Also, "[o]f the 35 admitted exhibits, two[-]thirds were related to the uncharged crimes," defendant informs us, whereas "only one[-]third [was related] to the charged crime."

¶ 150         But those statistics, in themselves, fail to demonstrate that any of the other-crimes evidence was *cumulative*. The appellate court has warned: "*Cumulative* evidence of other conduct can overpersuade the jury to convict the defendant as a bad person, rather than because he was guilty of the crime charged." (Emphasis added.) *People v. Brown*, 319 Ill. App. 3d 89, 96 (2001). Cumulative evidence and extensive evidence are not the same thing. Rather, "[e]vidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). To show, then, the cumulativeness of the other-crimes evidence, defendant would have to explain how the testimony of *B* on a particular subject added nothing to the preceding testimony of *A*. Or defendant would have to explain how a specified exhibit added nothing to another specified exhibit. Raw numbers showing the proportional quantity of other-

crimes evidence say nothing about whether any of the evidence was cumulative or redundant. One hundred twenty pages of testimony might have been "necessary to illuminate the issue for which the other crime was introduced." (Internal quotation marks omitted.) *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001).

¶ 151 Much of the other-crimes evidence tended to show defendant's constructive possession of narcotics. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27. Because a theory of constructive possession relies on inferences drawn from circumstantial evidence (*id.*), a more extensive presentation might be required for that theory than for a theory provable by direct evidence. If there was, proportionally, a lot of other-crimes evidence, it does not necessarily follow that the State was wasting time. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). A competent, convincing presentation on the theories of constructive possession and defendant's being in the heroin wholesale business might have required a lot of testimony.

¶ 152 Granted, when reading the statement of facts in defendant's brief, we see that testimonies overlapped in their subject matter. For example, Giovanelli testified that, in the search of Apartment C on December 20, 2016, he found a Dairy Queen bag in the kitchen cabinet and in the Dairy Queen bag were Baggies containing what looked like controlled substances. Likewise, using photographs and exhibits, Callaway testified to the discovery and seizure of the cocaine and heroin in the Dairy Queen bag. But Giovanelli was the police officer who discovered the Dairy Queen bag, whereas Callaway was the police officer tasked with documenting and collecting this and other evidence discovered by other police officers in the search of the apartment. Callaway's testimony added to Giovanelli's by establishing a chain of custody, which is important in drug cases.

¶ 153        Or, to take another example, Callaway and Mansfield sat side by side on December 20, 2016, and did a preparatory surveillance at 1345 East Wellington Way. Both testified to what they had seen. Arguably, though, Callaway's testimony was not cumulative over Mansfield's testimony. Callaway recalled an important detail that Mansfield missed: after defendant entered the Volkswagen, its headlights came on, as if defendant had started the engine so as to warm up the car for Jackson and her child. From that incidental detail, one might infer that defendant had keys to the Volkswagen and shared control of it with Jackson—the same Volkswagen in which, minutes later, heroin and cocaine were found. See *People v. Hester*, 87 Ill. App. 3d 50, 52 (1980) (explaining the doctrine of constructive possession). Our point is, it is not self-evident, from the statement of facts in defendant's brief, that the other-crimes evidence was cumulative as he contends. In the argument of his brief, he should explain how the other-crimes evidence was cumulative.

¶ 154        Without being cumulative, other-crimes evidence can take up a big chunk of the trial, and to be sure, it did in this trial. Case law predating the Illinois Rules of Evidence warns against "permit[ting] a 'mini-trial' of the other, uncharged offense." *Bedoya*, 325 Ill. App. 3d at 938. Illinois Rule of Evidence 403, however, does not use the expression "mini-trial" but, instead, warns against "confusion of the issues, *** misleading the jury, *** undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 155        It is hard to see how the jury could have been confused or misled by the other-crimes evidence, abundant as it was. Nine times in the trial, the circuit court instructed the jury: "Evidence will be received that the defendant has been involved in offenses other than that charged in the [i]nformation. The evidence will be received on the issue of defendant's intent and system

of operation and may be considered by you only for that limited purpose." In his closing argument, defense counsel emphasized to the jury that there was only one issue to decide:

"You're going to get a jury instruction about one issue. The one issue I told you about in the beginning of the case. The one issue wish I hope you have been thinking about for the last four days, and the one issue you'll have to decide when you go back to the jury room.

And that is: What happened on December 13, 2016[,] between [defendant] and Ebonie Dixon? That's the only issue in this case."

In the State's rebuttal argument to the jury, the prosecutor took up that thread, explaining in detail "how we know that what Ebonie Dixon said happened on the 13th of December of 2016 actually did happen." At the conclusion of the rebuttal argument, the prosecutor told the jury:

"And I submit to you, ladies and gentlemen, based on all of this evidence, everything that has been corroborated in this case, this defendant is guilty of the delivery of heroin[ ] to Ebonie Dixon on December 13, 2016. And I ask that you find him guilty at the end of this case and sign the guilty verdict in this case."

Then the circuit court instructed the jury: "The charge against the defendant in this case is contained in a document called the Information," which accused defendant of delivering heroin to Dixon on December 13, 2016. So, it appears that, throughout the proceedings, the jury's attention was repeatedly directed to the charging instrument.

¶ 156    Granted, a lot of evidence was presented about defendant's possession and distribution of drugs on dates other than December 13, 2016. That defendant, however, was in the business of drug-trafficking, with an apparent emphasis on heroin, was highly germane to the allegation in the charging instrument. And the relevance was not propensity. The suggestion, in

- 34 -

other words, was not that defendant was a bad person and that he was guilty because he must have acted in conformity to his bad nature (although there might have been a whiff of propensity in the fleeting reference to blood-soaked currency). The more obvious suggestion was that, quite apart from his character, delivering heroin to Dixon fit in with, or was in conformity to, defendant's ongoing lucrative occupation: supplying heroin to heroin-sellers. Proving defendant's line of business, as distinct from proving his character, could reasonably be regarded as worthwhile. Achieving evidentiary depth in this regard was, arguably, a rational use of time. See *id.*

¶ 157      This is not to deny that time was wasted, for instance, at the beginning of Dailey's testimony. We agree with the circuit court that his disquisition on how drugs entered the United States and were divvied up among American cities was irrelevant to the issues in this case. It is hard to understand why a prosecutor would be willing to imperil the prosecution with irrelevant matter like this. Defense counsel, however, could have prevented this waste of time by objecting as soon as the prosecutor asked Dailey: "Can you explain for us how cocaine is imported into the U.S., where it comes from?" instead of waiting until after Dailey gave his answer to object.

¶ 158      But defendant did make a timely objection to the other-crimes evidence. It might be argued that allowing most of the trial to be consumed by this other-crimes evidence was worse than merely wasting time—it was more pernicious—because all of this other-crimes evidence served an illegitimate purpose: propping up the ramshackle credibility of Dixon. Did not the supreme court plainly hold, in *People v. Thingvold*, 145 Ill. 2d 441, 459 (1991), that "evidence of other crimes is not admissible to bolster the credibility of a prosecution witness"? The other-crimes evidence served the sole purpose of making Dixon believable in her testimony that it was defendant who had delivered to her the heroin.

¶ 159        It is all right, however, for other-crimes evidence to bolster the credibility of a prosecution witness on "*any material question*." (Emphasis in original and internal quotations marks omitted.) *Id.* By contrast, using other-crimes evidence to bolster the credibility of a witness on an immaterial question so that the witness will be believed on a material question is an illegitimate use of other-crimes evidence. See *id.* But using other-crimes evidence to corroborate the witness's testimony on a material question is a legitimate use (see *id.* at 459-60), for then the other-crimes evidence supplements the witness's testimony on a "fact that is of consequence to the determination of the action" (Ill. R. Evid. 401 (eff. Jan. 1, 2011)). Dixon testified that defendant delivered heroin to her in the Best Buy parking lot on December 13, 2016. Whether he did so was a material question. The other-crimes evidence may well have made Dixon more believable on that material question. It was perfectly all right for the other-crimes evidence to serve that function.

¶ 160        The intended function of the other-crimes evidence, let us be clear, was to prejudice defendant. The prosecutor should be expected to present evidence prejudicial to the defendant. Defendant argues that "the other[-]crimes evidence was more prejudicial than probative." But that is a false dichotomy. Prosecution evidence can be probative precisely to the degree that it is prejudicial against the defendant, that is, to the degree it incriminates the defendant. The question is not whether other-crimes evidence is prejudicial to the defense. If it were not, the State surely would not bother presenting it. Rather, the question is whether "its probative value is substantially outweighed by the danger of *unfair* prejudice." (Emphasis added.) Ill. R. Evid. 403 (eff. Jan. 1, 2011). The qualifier is crucial. Not every reasonable mind would perceive unfairness in proving that a defendant accused of distributing heroin was in the business of distributing heroin.

¶ 161                    B. The Sufficiency of the Evidence

¶ 162　　　　The police watched Dixon in the late morning of December 13, 2016, as she waited in her Buick Enclave, in the Best Buy parking lot. Defendant's white Chevrolet Camaro pulled into the parking lot and parked close to Dixon's car. Dixon got out of her car and into the front passenger seat of defendant's car and remained in his car for 25 minutes. Then she got out of his car and back into her car, and both cars left the parking lot. Defendant drove to the apartment building at 1345 East Wellington Way and got out of his Camaro. Dixon drove onto Interstate Highway 72, where the police pulled her over. From Dixon's person, the police seized a total of 19.9 grams of heroin. Dixon represented to the police and, subsequently, to the jury that she had obtained these 19.9 grams of heroin from defendant, during their rendezvous in the Best Buy parking lot.

¶ 163　　　　For four reasons, defendant maintains that Dixon was not a credible witness. First, Dixon admitted she had entered into cooperation agreements that saved her from being charged with drug offenses. So, she was far from a disinterested reporter of the truth. Second, Dixon was impeached with numerous felony convictions, some of which were for crimes of dishonesty, such as forgery, identity theft, and bank fraud. Her convictions reflected, as defendant puts it, a "dismal character for truthfulness." Third, Dixon was impeached with prior recorded statements she had made to the police, "many of which she brazenly denied when testifying under oath before the jury." Fourth, Dixon's testimony on several material points was irreconcilable with the testimony of other witnesses and with the physical evidence. In sum, defendant argues, "Ebonie Dixon's testimony did not carry with it an absolute conviction of its truth."

¶ 164　　　　The absolute-conviction-of-truth language comes ultimately from a 100-year-old case, *People v. Grove*, 284 Ill. 429, 435 (1918). As late as 1998, the supreme court was still using that language with reference to accomplice testimony. See *People v. McLaurin*, 184 Ill. 2d 58, 79

(1998). "Because accomplice testimony is attended with serious infirmities," the supreme court said in *McLaurin*, "it should be accepted only with utmost caution and suspicion and have the absolute conviction of its truth." *Id.* It was as if accomplice testimony occupied a special category.

¶ 165    More recently, though, in *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004), the supreme court held that *all* eyewitness testimony was subject to the same deferential standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Jackson* "applies in all criminal cases," the supreme court declared, "*regardless of the nature of the evidence.*" (Emphasis added.) *Cunningham*, 212 Ill. 2d at 279. Specifically, when the believability of eyewitness testimony was at issue on appeal, *Jackson* called for the following analysis:

> "*Jackson* requires reviewing courts to determine whether the record evidence could *reasonably* support a finding of guilt beyond a reasonable doubt. *** [Citation.] It follows that where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. In conducting this inquiry, the reviewing court must not retry the defendant. [Citation.] The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witness. [Citation.] Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *Id.* at 279-80.

¶ 166    Evaluating testimony "in light of the record," as *Cunningham* puts it, entails looking for circumstantial evidence that arguably tends to corroborate the testimony or make it

- 38 -

more believable than the testimony otherwise might have been. See *id.* In this case, the circumstantial evidence was other-crimes evidence. In a footnote of his brief, defendant admits that his assessment of Dixon's testimony "does not include the extensive 'other crimes' evidence which was introduced at trial"—evidence which, he contends, "was not relevant" and "should not be considered in determining whether [defendant] was proved guilty beyond a reasonable doubt." For the reasons we have explained, however, we find no abuse of discretion in the admission of the other-crimes evidence.

¶ 167        In the light of the other-crimes evidence, a reasonable trier of fact could believe Dixon, despite her flaws, when she testified that she obtained the 19.9 grams of heroin from defendant. Defendant, after all, was in the business of supplying heroin to heroin-sellers just like her. Why else would he have met her in the Best Buy parking lot? What other business could Dixon have had with him? There was no indication in defendant's apartment and vehicles that he himself was a user of heroin—with which, anyway, he already was abundantly supplied. Dailey testified that distributors of narcotics commonly met their clients in public places where they could "blend in." A Best Buy parking lot would be ideally suited to that purpose. And, as documentary evidence showed, Dixon had made a MoneyGram transfer of $250 to Jackson, defendant's partner in his drug-trafficking business. Thus, there already had been commerce between Dixon and defendant's associate in the heroin trade. Such circumstantial evidence, in the mind of a reasonable trier of fact, could lend credence to Dixon's testimony that it was defendant who, in the meeting in the Best Buy parking lot, delivered the heroin to her that the police seized from her minutes afterward.

¶ 168        C. Remarks by the Prosecutor in His Closing Argument

¶ 169    Defendant complains that two remarks by the prosecutor in the State's closing argument deprived defendant of a fair trial.

¶ 170    First, the prosecutor told the jury:

"And we also learned it's very profitable, that's why people like Ebonie Dixon sell drugs. With very little effort, very little you put into it, you can make a lot of money living off putting this poison out on the streets and everybody else's misery, the user's misery. You don't have to go to work 40 hours plus a week like most of the rest of us do."

¶ 171    Second, the prosecutor made the following argument to the jury:

"And, ladies and gentlemen, momentarily you'll be asking yourself a very important question. And that question is: Is [defendant] just the most unluckiest guy in the world or is he just guilty? Is he a fly in the world of windshields or does he look guilty in this case because he is guilty[?]"

¶ 172    Defendant acknowledges that he never made a contemporaneous objection to either of those remarks by the prosecutor. Generally, "to preserve a question for appellate review, both a trial objection and a written posttrial motion raising the issue are required." *People v. Griffin*, 368 Ill. App. 3d 369, 375-76 (2006). Defendant seeks to avert the forfeiture by invoking the first prong of the plain-error doctrine. That is, he argues that (1) the evidence was closely balanced and (2) these erroneous remarks by the prosecutor could have unfairly tilted the trembling scales against him. See *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 173    In plain-error review, the threshold question is whether a clear or obvious error was committed. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Defendant contends that the first remark by the prosecutor was erroneous because it "invited the jury to 'send a message' that crime in

general will not be tolerated." This remark, in his view, "serve[d] no purpose but to inflame the jury." See *People v. Blue*, 189 Ill. 2d 99, 127-28 (2000); *People v. Johnson*, 208 Ill. 2d 53, 76 (2003). But the prosecutor never invited the jury to send a message, nor did the prosecutor urge the jury to help solve society's drug problem. Instead, the prosecutor merely explained defendant's incentive to commit the offense with which he was charged: drug-dealing was lucrative and required little work. The prosecutor's legitimate aim, in his closing argument, was to persuade the jury that defendant had committed the charged offense. To that end, the prosecutor pointed out a motive for defendant to commit the charged offense: prosperity with minimal effort.

¶ 174    The prosecutor further argued that, in making this easy money, defendant had been poisoning people. The appellate court already has decided that such an argument is within bounds. A prosecutor may legitimately assert that an accused drug-dealer has been poisoning the community if evidence has been presented to support that assertion. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 56. In *Deramus*, the prosecutor argued to the jury "that [the] defendant sold 'poison' and was 'ruining that neighborhood for the people that live there.' " *Id.* ¶ 54. In rejecting the defendant's criticism of that argument, the appellate court held: "It was not improper for the prosecution in this case to comment upon the negative effects of defendant's conduct in its closing argument." *Id.* ¶ 56. Therefore, we find no clear or obvious error in the first remark of which defendant complains. See *Hillier*, 237 Ill. 2d at 545.

¶ 175    The prosecutor's second remark—about " 'the unluckiest man in the world' " and a " 'fly on the windshield' "—likewise "served no useful purpose," defendant argues. Worse yet, defendant claims, this remark "tended to shift and to minimize the burden of proof." We disagree. This remark said nothing about the burden of proof nor did it require defendant to prove anything. Instead, the prosecutor posed the fair question of whether the evidence unfavorable to defendant

could reasonably be attributed to coincidence. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields [citation], even if such inferences reflect negatively on the defendant." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). That is all the prosecutor did in the second remark of which defendant complains—commented on the evidence, as prosecutors are expected to do in a closing argument. Therefore, we find no clear or obvious error in the second remark, either, and the procedural forfeiture of defendant's criticisms of the prosecutor's closing argument will be honored. See *Hillier*, 237 Ill. 2d at 545.

¶ 176     D. The Claim That Trial Counsel Rendered Ineffective Assistance by Omitting

to Object to the Prosecutor's Closing Argument

¶ 177     Defendant accuses his trial counsel of rendering ineffective assistance by omitting to object to the prosecutor's closing argument. Because the prosecutor's remarks of which defendant complains were not clearly or obviously erroneous, we are unconvinced that refraining from objecting to them fell outside "the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Consequently, the claim of ineffective assistance fails.

¶ 178     III. CONCLUSION

¶ 179     To recap, we find no abuse of discretion in the admission of the other-crimes evidence, which, for reasons other than propensity, arguably lent support to Dixon's testimony that the meeting the police observed in the Best Buy parking lot was a drug transaction with defendant. After all, he pulled up alongside Dixon in his Camaro, and she got into his Camaro. He was, one could reasonably infer, in the business of selling heroin—and, sure enough, heroin was found on Dixon immediately after the meeting. We know it was defendant driving the Camaro because the police followed him from Best Buy and watched him get out of the Camaro. The other issue that

defendant raises, the supposedly impermissible remarks by the prosecutor in her closing argument, is procedurally forfeited. Absent a clear or obvious error in those remarks, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture. Therefore, we affirm the circuit court's judgment.

¶ 180    Affirmed.

**No. 4-19-0909**

| | |
|---|---|
| **Cite as:** | *People v. Jones*, 2020 IL App (4th) 190909 |
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, No. 17-CF-1758; the Hon. James R. Coryell, Judge, presiding. |
| **Attorneys for Appellant:** | Stephen L. Richards, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |